## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

B.E. CAPITAL MANAGEMENT FUND LP,
on behalf of itself and all others similarly
situated,

               Plaintiff,

     - against -

FINANCIAL INDUSTRY REGULATORY
AUTHORITY, INC. and THE DEPOSITORY
TRUST COMPANY,

               Defendants.

Case No. 17-cv-____

**Class Action**

## VERIFIED COMPLAINT

Plaintiff B.E. Capital Management Fund LP, on behalf of itself and a class of all other

similarly situated persons that purchased common stock issued by DNIB Unwind, Inc. after the

close of business ("COB") on August 25, 2016 and held such shares through October 11, 2016,

hereby alleges:

## NATURE OF ACTION

1.      This action arises from the failure by the Financial Industry Regulatory Authority,

Inc. ("FINRA") to set an ex-dividend date ("ex-date") for distributions on account of shares issued

by DNIB Unwind, Inc. (f/k/a BIND Therapeutics, Inc.), the failure of the Depository Trust

Company (the "DTC") to abide by its own rules and procedures in effecting such distributions,

and the resulting disbursement of $8 million to the wrong shareholders by the Liquidating Trustee

under the Plan (each defined below).  This action seeks to prevent further misdirection of funds.

To wit:

2.      FINRA is responsible for setting an ex-date, which is the date on and after which

the right to a distribution is no longer transferred with shares, for distributions on account of over-

the-counter ("OTC") securities in accordance with Rule 11140(b) of its Uniform Practice Code (the "UPC").

3.      Prior to February 2017, Rule 11140(b)(1) provided that if a per-share dividend or other distribution is under 25% of the securities issuer's share price, the ex-date for the distribution is the second business day preceding the "record" date.[1]  Pursuant to Rule 11140(b)(2), if the per-share distribution is over 25% or more of the issuer's share price, the ex-date is the first business day after the "payable" date.

4.      FINRA abandoned its responsibility for setting the ex-date with respect to the Initial Equity Distribution (defined below) of $8 million under the Plan of DNIB and its debtor subsidiary (collectively, the "Debtors") to holders of the company's shares, which traded OTC under ticker symbol BINDQ until October 11 (the effective date of the Plan).

5.      As a result, when the distribution was paid by the Liquidating Trustee to DTC on or about December 15, 2016 through the Debtors' transfer agent, DTC lacked instructions from FINRA as to whether the distribution should be made to shareholders in accordance with Rule 11140(b)(1) or (b)(2).

6.      Although FINRA clearly indicated in its September 1, 2016 "daily list" notice that Rule 11140(b)(2) applied, and DTC could have easily concluded as much from the public record, DTC nevertheless treated the distribution as a normal (not large, or above 25%) one and made payment to shareholders as of COB on August 25, which is the third business day before the August 30, 2016 record date under the Plan, thereby setting a *de facto* August 26, 2016 ex-date.

---

[1] The 2017 amendment made the ex-date the first business day preceding the record date, instead of the second.  This amendment was made to conform the FINRA Rules to a proposed amendment to Rule 15c6-1(a) under the Securities Exchange Act of 1934 (the "Exchange Act") to shorten the standard settlement cycle for broker-dealer transactions from three business days after the trade date ("T+3") to two business days after the trade date ("T+2").

7.     This resulted in the distribution of $8 million to the wrong shareholders. The Initial Equity Distribution should have been distributed by DTC in accordance with Rule 11140(b)(2) to the shareholders as of COB on October 11, the last business day prior to the ex-date on which the Debtors' shares were publicly traded.

8.     Plaintiff recognizes it is now too late to unwind that distribution and is not seeking monetary damages herein, but seeks declaratory relief on behalf of itself and all other similarly situated persons that purchased shares after COB on August 25 and held such shares through October 11 (the "Class") to ensure that mistake is not repeated, as the liquidating trust still has roughly $18 million to distribute, upon information and belief.

## PARTIES

9.     Plaintiff is a Delaware limited partnership headquartered in New York.  Plaintiff purchased 105,000 shares between July 26 and July 27, 2016 which it held through October 11. Plaintiff also purchased more than 105,000 additional shares after September 1, 2016 which it held through October 11.  Plaintiff did not sell any shares from and after July 26.

10.     FINRA is Delaware corporation headquartered in Washington, D.C.  FINRA's primary responsibility is broker-dealer regulation, but it is required to perform issuer-related functions pursuant to Rule 10b-17 under the Exchange Act and the UPC, including setting an ex-date for distributions on account of shares that traded OTC.

11.     DTC is a trust company established under New York banking law and an SEC-registered clearing agency headquartered in New York.  The SEC has summarized DTC's role in the securities market as follows:

> DTC was created by the securities industry to improve efficiencies and reduce risk in the clearance and settlement of securities transactions.  Today, DTC is the largest securities depository in the world …

As a clearing agency registered with the SEC, DTC provides security custody and book-entry transfer services for securities transactions in the U.S. market involving equities … DTC accepts deposits of securities from its participants (i.e., broker-dealers and banks), credits those securities to the depositing participants' accounts, and effects book-entry movements of those securities.

Most large U.S. broker-dealers and banks are DTC participants, meaning that they deposit and hold securities at DTC. DTC appears in an issuer's stock records as the sole registered owner of securities deposited at DTC. DTC holds the deposited securities in "fungible bulk," meaning that there are no specifically identifiable shares directly owned by DTC participants. Rather, each participant owns a pro rata interest in the aggregate number of shares of a particular issuer held at DTC. Correspondingly, each customer of a DTC participant, such as an individual investor, owns a pro rata interest in the shares in which the DTC participant has an interest.

Because the securities held by DTC are for the benefit of its participants and their customers (i.e., investors holding their securities at a broker-dealer), frequently the issuer and its transfer agent must interact with DTC in order to facilitate the distribution of dividend payments to investors, to facilitate corporate actions (i.e., mergers, splits, etc.), to effect the transfer of securities, and to accurately record the number of shares actually owned by DTC at all times.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1331 and 2201 and 15 U.S.C. § 78aa.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Ex-date; FINRA Rule 11140

14.    Once a distribution has been declared by an issuer of public securities, three dates govern its payment:

(a)    Record Date.  This is the date ordinarily used to determine which shareholders are entitled to receive the distribution.  It is set by the issuer pursuant to Rule 10b-17(b)(1).

(b)    Payable Date.  This is the date on which the distribution is scheduled to be paid.  It is also set by the issuer pursuant to Rule 10b-17(b)(1).

(c)    Ex-Date.  This is the date on and after which the right to a distribution is no longer transferred with the sale of stock.  It is set pursuant to Rule 11140(b), which FINRA is responsible for enforcing with respect to OTC securities pursuant to FINRA Rule 11100(a).

15.    Prior to February 2017 (*see* note 1), Rule 11140(b), provided as follows:

> (1) In respect to … distributions … which are less than 25% of the value of the subject security … the date designated as the "ex-dividend date" shall be the second business day preceding the record date if the record date falls on a business day, or the third business day preceding the record date if the record date falls on a [holiday].
> (2) In respect to … distributions … which are 25% or greater of the value of the subject security, the ex-dividend date shall be the first business day following the payable date.

16.    The reason why the ex-date was ordinarily two days before the record date is because securities do not settle under the T+3 rule until three days after the trade date.  An exception was made for large distributions, however, since if the ex-date for a large distribution preceded the payable date, the drop in share price that would accompany the ex-date could trigger a margin call prior to receipt of the distribution.

17.     The NASD[2] Notice to Members 00-54 illustrates how Rule 11140 is supposed to

work:

> UPC Rule 11140 governs the designation of ex-dates for securities. The ex-date is the date on or after which a security is traded without a specific dividend or distribution. The payable date is the date that the dividend is sent to the record owner of the security. Under the UPC, two methods are used to determine the ex-date of a security, depending on the size of the dividend or distribution.
>
> ***Dividends Or Distributions Less Than 25 Percent Of Security Value*** The first method, under subparagraph(b)(1) of Rule 11140, provides that for dividends or distributions that are less than 25 percent of the value of the subject security, the date designated as the ex-date shall be the second business day preceding the record date. For example, if the issuer of the security has announced a date falling on a Thursday as the record date of a distribution, the ex-date will be on Tuesday, two days earlier. The price of the stock is adjusted downward on the ex-date so that the amount of the distribution is reflected in the current stock price. Thus, in this example, Tuesday is the day on or after which a buyer would purchase the security without the dividend and the seller of the security would keep the dividend. If the sale occurred on Monday, a day earlier, the seller would not keep the dividend.
>
> ***Dividends Or Distributions 25 Percent Or Greater Than Security Value*** The second method, under subparagraph (b)(2) of Rule 11140, provides that for dividends or distributions that are 25 percent or greater of the value of the subject security, the ex-date shall be the first business day following the payable date. For example, if an issuer has announced August 10 as the record date and August 31 as the payable date, then the ex-date will be September 1, the first business day after the payable date. In this example, September 1 is the day on or after which a buyer would purchase the security without the dividend and, therefore, the day on which the price of the stock is adjusted downward. In this example, a seller of the security on August 15, even though the holder of record to receive the dividend, would have to relinquish the dividend to the buyer. Indeed, because the value of the security on August 15 has not yet been adjusted downward to reflect the dividend

---

[2] The National Association of Securities Dealers (NASD) was the self-regulatory organization responsible for the operation and regulation of the NASDAQ stock market and OTC markets. In 2007, it merged with the New York Stock Exchange's member regulation, enforcement and arbitration operations to form FINRA.

distribution, the seller in this example would be unjustly enriched by keeping the dividend. The seller would have received the value of the dividend twice: first, as fully reflected in the unadjusted price of the stock on August 15; and secondly, as subsequently paid by the company to record date holders.

NASD Notice to Members 00-54 at 371-2 (2000).

18.     Rule 11140(b)(2) is implemented by FINRA Rule 11630 and interim accounting procedures described in DTC's Service Guides on Dividends and Distributions.  Pursuant to these procedures, after the record date but before the ex-date, shares are traded with a "due bill" attached to them.  The distribution is paid by DTC first to record date shareholders.  Later, on the "due bill settlement" date, which is two business days after the ex-date, the distribution is withdrawn from the accounts of record date holders who sold shares between the record and ex-dates and that amount is then paid to holders on the first business day preceding the Rule 11140(b)(2) ex-date. The entire process is handled by broker-dealers and does not involve the issuer.

## II.     The Bankruptcy Cases

19.     The Debtors filed for protection under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on May 2, 2016.  Their cases were administratively consolidated under Case No. 16-11084 (BLS).

20.     On July 2, the Debtors' filed a motion to sell substantially all of their assets to Pfizer, which had submitted a stalking horse bid of $19.75 million, subject to higher bids, and on July 27, 2016, the Bankruptcy Court entered an order approving the sale to Pfizer for $40 million.

21.     On August 1, the Debtors engaged Geoffrey Berman as their Chief Restructuring Officer.

22.     On August 15, the Debtors proposed their initial combined disclosure statement and plan (as amended, the "Plan").  The disclosure provisions stated that the Debtors' prepetition

lender was paid approximately $9.1 million in full and final satisfaction of its claim upon the closing of the Pfizer sale, and that estimated allowed general unsecured claims totaled just $5.2 million.

23.    The Plan further includes the following provisions governing shareholder distributions:

(a)    Allowance. Section VIII.A.6.c provides that "BIND Equity Interests" held by "Holders thereof as of the Distribution Record Date shall be Allowed." The Plan defined the term "Holder" as "beneficial holder," and "Distribution Record Date" as August 30, 2016.[3]

(b)    Treatment. Section VIII.A.6.d of the Plan provides (i) on the Plan effective date, "all BIND Equity Interests shall be cancelled," (ii) holders of allowed interests shall receive an "Initial Equity Distribution" of at least $8 million within 90 days following the effective date, and (iii) the entire residual value of the Debtors' estates (after payment of allowed claims) shall be distributed to shareholders.[4]

(c)    Distribution; Liquidating Trust. The Plan vested all property of the Debtors in a liquidating trust, and charged Berman, as liquidating trustee (the "Liquidating Trustee"), with responsibility for making distributions from the trust res pursuant to the Plan to shareholders through the Debtors' transfer agent. Significantly, however, the Plan did not distribute liquidating trust interests to shareholders (as is

---

[3] The Plan's definition of "Allowed" speaks to allowed claims only (not interests).

[4] Specifically, Section VIII.A.6.c provides that after the Initial Equity Distribution, no further distributions shall be made to holders of allowed BIND Equity Interests unless and until all allowed claims are paid. Confirmation Order ¶¶ AA and HH provide the entire residual value of the Debtors' estates shall be paid to shareholders.

ordinarily done in liquidating chapter 11 cases), meaning distributions to shareholders must be made on account of shares held on or before the date shares were cancelled and ceased trading.

24.     On August 30, the Debtors filed a Form 8-K stating they intended to *only* pay beneficial owners of shares as of the COB on the Distribution Record Date, and not persons that purchase shares thereafter.

25.     On September 26, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order"). Paragraph 15 of the Confirmation Order provides "[o]n the Effective Date, except for purposes of evidencing a right to receive a Distribution pursuant to the Plan and the Distribution Record Date contained therein, any … Equity Interests in BIND … shall be deemed cancelled." In case of a conflict between the Plan and Confirmation Order, the latter controls. Confirmation Order at ¶ 48.

26.     The Plan became effective, and trading in the Debtors' shares ceased on October 11, 2016. The closing price on that day was $.15/share.

### III.     The Initial Equity Distribution

27.     Pursuant to Rule 10b-17, issuers are required to give FINRA at least ten days' prior notice of a distribution. FINRA publishes the contemplated distributions, plus other corporate actions that fall under Rule 10b-17, on its website in a document known as the "daily list," which publication effectively announces the action to the market.

28.     The daily list notice for the Initial Equity Distribution, posted September 1, 2016, provided as follows:



**Daily List Events**

**Summary**

| Date/Time | Event Type | Symbol | Market | Eff/Ex Date/Time | Issue Name |
|---|---|---|---|---|---|
| 09/01/2016 10:17:26 | Cash Dividend Special | BINDQ | Other OTC | | DNIB Unwind, Inc. Common Stock |

**Comments**

Distribution Amount & Pay Date TBD. Distribution will not be quoted Ex by FINRA. Please see Bankruptcy Plan, Issuer's SEC filings for additional deta

**Details**

| | Previous Value | Current Value |
|---|---|---|
| Symbol | BINDQ | BINDQ |
| Issue Name | DNIB Unwind, Inc. Common Stock | DNIB Unwind, Inc. Common Stock |
| Class | | |
| Financial Status Indicator | Q | Q |
| Market Category | Other OTC | Other OTC |

| | Current Value |
|---|---|
| | 09/01/2016 10:17:26 |
| Event Type | Cash Dividend Special |
| Effective/Ex Date/Time | |
| Subject to Corporate Action | CD |
| | No Restrictions |
| | |
| Dividend Type | Cash Dividend |
| Percentage | 0 |
| Cash Amount | 0 |
| | 08/30/2016 00:00:00 |

29.     Three notations in this announcement make clear FINRA knew or should have known that Rule 11140(b)(2) applied to the distribution.  First, the "Subject to Corporate Action" field identified the distribution as "CD."  The OTC Equities Daily List User Guide, as in effect at the time the distribution was made, states:

> A CD in this field indicates that the security is currently subject to a
> corporate action with a distribution of greater than or equal to 25%
> of the value of the security. Please note that this flag will be removed

from the security 19 business days after the effective date of the dividend, distribution or split.[5]

30.     <u>Second</u>, the Comments field states shares "will not be quoted ex," which means the shares will not be quoted "ex-dividend" or without the dividend.  The only logical conclusion which can be drawn from this is that post-announcement the shares were trading *with* the dividend, which would only be the case if the ex-date had not yet passed (*i.e.*, Rule 11140(b)(2) applied).

31.     <u>Third</u>, the ex-date field is blank, which only makes sense if Rule 11140(b)(2) applied because the Distribution Record Date was set by the Plan, meaning one could easily calculate the ex-date if it were below the 25% threshold under the rule.  However, if Rule 11140(b)(2) applied the Distribution Record Date would not be enough to determine the ex-date because the payable date remained unknown.

32.     On November 23, 2016, the Liquidating Trustee filed a Notice of Distribution with the Bankruptcy Court stating he intended to make an Initial Equity Distribution in the amount of $8 million.  In a Form 8-K filed with the SEC on November 29, the Liquidating Trustee specified that the distribution would be made "to the holders of record at the COB on August 30, 2016 of the Company's former common stock."

33.     No update was made to the above daily list announcement, and FINRA never set an ex-date for the Initial Equity Distribution.

34.     On December 15, 2016, the Liquidating Trustee transferred $8 million to DTC through its stock transfer agent.  The $8 million distribution was "25% or greater of the value of the subject security."

---

[5] The January 2017 amendment to the guide modified the implications of a "CD" by adding the following sentence: "Users should reference the Eff/Ex-Date field for the actual Eff/Ex-Date if applicable."

35.     DTC took the unusual step of holding the funds for five days, presumably to evaluate if it was required to apply interim accounting procedures notwithstanding the fact that FINRA did not set an ex-date.

36.     On December 20, 2016, DTC made the distribution to shareholders.   The distribution was based on an August 26 ex-date that it set, apparently based on the August 30, 2016 record date provided in the Plan and referenced in the Liquidating Trustee's November 23 distribution notice.

37.     That makes no sense, however, because under the interim accounting procedures the record date is largely irrelevant, and merely is used to identify shareholders in whose accounts a large distribution is temporarily parked between the payable date and due bill settlement date.

38.     Thus, FINRA abandoned its responsibility for setting an ex-date, and DTC made the distribution by selecting an ex-date that was incorrect, as the $8 million distribution was greater than the 25% threshold under Rule 11140(b)(2) by a wide margin.

39.     Following the distribution, many post-August 30 purchasers inquired of FINRA and DTC concerning their failure to distribute the Initial Equity Distribution in the manner required by Rule 11140(b).

40.     FINRA disclaimed responsibility for having to set an ex-date because the shares were cancelled pursuant to the Plan and ceased trading on October 11, over two months before the Initial Equity Distribution.

41.     However, nothing in the FINRA Rules absolves FINRA from having to set an ex-date under these circumstances.  Indeed, there can be little doubt that liquidating distributions made on account of shares (as opposed to liquidating trust interests) fall within the scope of Rule

11100(a), which provides that the UPC covers "[a]ll over-the-counter secondary market transactions in securities," and that, consequently, Rule 11140(b) also applies.

42.     Moreover, as noted above, the shares were not cancelled for distribution purposes under the Confirmation Order.

43.     DTC should have ensured a Rule 11140(b)-compliant ex-date was set before $8 million was distributed without FINRA having specified which ex-date applied.  Moreover, it could and should have concluded Rule 11140(b)(2) applied from publicly available information, such as the daily list notice, or by manually dividing the distribution amount ($8 million) into the number of shares outstanding (20.88 million) and recognizing the result ($.38/share) is greater than the 25% threshold under the rule.  However, as noted above it effected the distribution based on an August 26 ex-date.

## CLASS ALLEGATIONS

44.     Persons in the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown, as the Debtors' shares were traded publicly through October 11.  Plaintiff believes that there are hundreds of members in the proposed Class. Class members will be identified through the records of DTC and its participants.

45.     Common questions of law and fact exist as to Class members, including:

(a)     Whether FINRA was or is required to set an ex-date in accordance with Rule 11140(b) with respect to distributions by the Liquidating Trustee to shareholders notwithstanding their treatment under the Plan and Confirmation Order, and the fact that public trading in the Debtors' shares ceased;

(b)      Whether DTC was permitted to set a *de facto* August 26 ex-date by effecting a

distribution to shareholders as of COB on August 25, notwithstanding FINRA's

failure to set an ex-date;

(c)      Whether DTC was required to set an ex-date in accordance with Rule 11140(b)(2)

and apply its interim accounting procedures, again notwithstanding FINRA's

failure to set an ex-date; and

(d)      Whether Rule 11140(b) applies by operation of Rule 11100(a) as a result of the fact

that the Plan requires that the Liquidating Trustee make distributions to

shareholders on account of shares that traded on or before the effective date, as

opposed to liquidating trust interests issued on or after the effective date.

46.      Plaintiff's claims are typical of those in the Class, as Class members were similarly

impacted by FINRA's failure to set an ex-date in accordance with Rule 11140(b) and DTC's

setting an incorrect *de facto* ex-date and not applying its interim accounting procedures.

47.      Plaintiff will fairly and adequately protect the interests of the proposed Class.

Plaintiff has engaged counsel that is competent and experienced in complex bankruptcy and

business litigation, and has the resources needed to represent the Class effectively.

48.      Class certification is appropriate under Rule 23(b)(2) because FINRA disclaimed

responsibility for having to set an ex-date for distributions on account of the Debtors' shares, an

act which affects all Class members, thereby rendering declaratory relief appropriate in respect of

the entire Class.

49.      Class certification is also appropriate under Rule 23(b)(3) because questions of law

and fact common to the Class predominate over questions affecting only individual members, and

because a class action is superior to other available methods for the fair and efficient adjudication

of this litigation, particularly where, as here, individual members may lack the financial resources needed to prosecute a lawsuit in federal court against self-regulatory organizations under the Exchange Act, and the individual monetary value of the relief sought herein may be small relative to the expense and burden of individual prosecution of this litigation.

## COUNT 1
### Declaratory Judgment
### (Against FINRA)

50.     Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

51.     Upon information and belief, the liquidating trust holds approximately $18 million available for distribution to shareholders.

52.     One or more additional distributions to shareholders is imminent.

53.     An actual case or controversy exists as to whether FINRA is required to set an ex-date for any future distribution by the Liquidating Trustee in accordance with Rule 11140(b), as FINRA has made clear it believes it is not responsible for setting an ex-date now that the Debtors' shares have been cancelled and have ceased trading.

54.     Plaintiff seeks a declaratory judgment that FINRA is required to set an ex-date for future distributions to shareholders in accordance with Rule 11140(b).

## COUNT 2
### Declaratory Judgment
### (Against DTC)

55.     Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

56.     If FINRA is not required to set an ex-date, an actual case or controversy exists as to whether Rule 11140(b)(2) would apply with respect to any future distribution to shareholders

as to which DTC sets the ex-date, and whether DTC is required to follow its interim accounting procedures in making any such distributions, as DTC did not apply such rule in determining the ex-date with respect to the Initial Equity Distribution or follow its interim accounting procedures in making such distribution.

57.    Plaintiff seeks a declaratory judgment that Rule 11140(b)(2) would apply with respect to future distributions to shareholders with respect to which DTC determines the ex-date, and that DTC is required to follow its interim accounting procedures in making any such distribution.

WHEREFORE, Plaintiff seeks (1) a declaratory judgment that (a) FINRA is required to set an ex-date for future distributions to shareholders in accordance with Rule 11140(b), and (b) Rule 11140(b)(2) would apply with respect to future distributions to shareholders as to which DTC determines the ex-date, and DTC is required to follow its interim accounting procedures in making any such distribution, and (2) such other and further relief as the Court determines to be just and proper.

Dated: March 22, 2017
       Wilmington, Delaware

KLEIN LLC

*/s/ Julia Klein*
Julia B. Klein
919 North Market Street
Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

*Attorneys for Plaintiff*
*and the Putative Class*

## VERIFICATION

STATE OF NEW YORK   )
                          )  ss:
COUNTY OF NEW YORK  )

THOMAS BRAZIEL, being duly sworn, deposes and states:

I am the Managing Partner of Plaintiff B.E. Capital Management Fund LP. I hereby state under penalty of perjury that I have read the foregoing Verified Complaint and know the contents thereof, that the matters contained therein are true as it concerns Plaintiff, and that so far as it relates to any other matters it is believed by me to be true.

B.E. CAPITAL MANAGEMENT FUND LP

Thomas Braziel
Managing Partner

Subscribed to and sworn before
Me this 20ᵗʰ day of March, 2017

Notary Public

LAINIE ASCH
Notary Public, State of New York
No. 01AS4972501
Qualified in New York County
Commission Expires November 22, 2018