# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| B.E. CAPITAL MANAGEMENT FUND LP, on behalf of itself and all others similarly situated,<br><br>            Plaintiff,<br><br>- against -<br><br>FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. and THE DEPOSITORY TRUST COMPANY,<br><br>            Defendants. | Case No. 17-311 (UNA) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

KLEIN LLC
Julia B. Klein (DE 5198)
919 North Market Street
Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

*Attorneys for Plaintiff
and the Putative Class*

Dated: March 23, 2017
       Wilmington, Delaware

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

ARGUMENT ................................................................................................................................ 4

I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ......................................... 4

    A. FINRA is Required to Set an Ex-Date in Accordance with Rule 11140(b) ........... 4

    B. Rule 11140(b)(2) Applies to Any Distribution as to Which DTC Sets the Ex-Date, and DTC is Required to Follow Interim Accounting Procedures in Making Any Such Distribution .................................................................................. 6

    C. Response to Denial of Confirmation Objection ..................................................... 8

II. PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF .............................................................................................................................. 11

III. THE BALANCE OF EQUITIES TIPS IN PLAINTIFF'S FAVOR .............................. 12

IV. AN INJUNCTION IS IN THE PUBLIC INTEREST ..................................................... 13

V. RULE 65(c)'S SECURITY REQUIREMENT SHOULD BE WAIVED ...................... 13

CONCLUSION ............................................................................................................................ 14

# **TABLE OF AUTHORITIES**

**Cases**

15 U.S.C. § 78c ............................................................................................................................. 5

15 U.S.C. § 78s ......................................................................................................................... 5, 10

*Am. Benefits Group, Inc. v. NASD*, No. 99-cv-4733, 1999 WL 605246 (S.D.N.Y. Aug. 10, 1999) ............................................................................................................................................... 6

*Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49 (2d Cir. 1996) ....................................... 13

*Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999) .................................. 12

*Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205 (3d Cir. 2014) .... 5

in *Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*, 446 Fed. Appx. 453 (3d Cir. 2011) ...... 12

*In re Arctic Glacier Int'l, Inc.*, No. 15-ap-51732, 2016 WL 3920855 (Bankr. D. Del. July 13, 2016) ........................................................................................................................................ 7, 9

*In re NASD*, Exchange Act Rel. No. 37538, 62 SEC Docket 1346 (Aug. 8, 1996) ....................... 6

*Morgan Keegan & Co. v. Johnson*, No. 2:11-cv-502, 2011 WL 7789796 (E.D. Va. Dec. 22, 2011) ............................................................................................................................................ 7

*Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112 (2d Cir. 2011) ........................................ 13

**Statutes**

17 CFR 240.10b-17 .................................................................................................................... 4, 5

**Rules**

Federal Rule of Civil Procedure 65(c) ............................................................................... 2, 13, 15

FINRA Rule 11100(a) .................................................................................................................... 4

FINRA Rule 11140(b) ........................................................................................................... passim

FINRA Rule 11140(b)(2) .................................................................................................... 2, 3, 5, 8

FINRA Rule 11630 ........................................................................................................................ 7

**Regulations**

SEC Release No. 47978, 2003 WL 21288541 (June 4, 2003) ....................................................... 6

Plaintiff B.E. Capital Management Fund LP, on behalf of itself and a class of all other similarly situated persons, submits this memorandum of law in support of its motion for an order (1) enjoining Defendant The Depository Trust Company ("DTC") from setting an official or unofficial ex-dividend date (or "ex-date") for any distribution to holders of shares in DNIB Unwind, Inc., or effecting any such distribution through DTC's participants, pending entry of a final judgment on Plaintiff's claims herein; and (2) waiving Rule 65(c)'s security requirement.[1]

## PRELIMINARY STATEMENT

The Liquidating Trustee appointed under the Plan made an $8 million distribution to shareholders on or about December 15, 2016. Compliance with FINRA Rule 11140(b) would have resulted in such distribution being paid to shareholders as of COB on October 11, 2016. However, the distribution was instead paid to shareholders as of COB on August 25, 2016 because FINRA abandoned its responsibility to set an ex-date with respect to the distribution, and DTC set the wrong ex-date and refused to apply interim accounting procedures that would have resulted in the distribution being directed to the correct shareholders. In its Complaint, Plaintiff seeks declaratory relief against FINRA and DTC to ensure that mistake is not repeated with respect to any future distributions, which are expected to total roughly $18 million.

By its motion, Plaintiff seeks preliminary relief enjoining DTC from setting an ex-date with respect to any future distribution, or effecting any distribution through its participants, during this action's pendency. Such relief is needed because FINRA and DTC have made clear they have no intention of enforcing their rules or procedures with respect to any future distribution, and October 11 shareholders will not be able to unwind any such distribution or seek monetary

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Complaint (the "Complaint").

1

damages from parties responsible for or that receive the same. Moreover, the balance of harms and the public interest weigh in favor of such preliminary relief as the only harm that would result from the same would be delay associated with any future distribution, and even then only if this Court determines October 11 shareholders are <u>not</u> entitled to such distribution.

Plaintiff also seeks a waiver of the security requirement under Federal Rule of Civil Procedure 65(c) because the preliminary relief Plaintiff seeks would not harm any party to this action, and any resulting delay would not materially harm affected shareholders.

## **BACKGROUND**

Pertinent background facts are set forth in the Complaint, and are incorporated herein by reference.

In short, prior to Plan confirmation, Geoffrey Berman, then acting as Chief Restructuring Officer, represented in a Form 8-K that only shareholders as of August 30, 2016 would receive distributions under the Plan. (Form 8-K, filed August 30, attached as **Exhibit 1** to the accompanying Declaration of Julia B. Klein ("<u>Klein Decl.</u>"))

Significantly, however, the Plan required that Berman, acting as Liquidating Trustee, make an Initial Equity Distribution of at least $8 million within 90 days following the effective date on account of shares owned before they were cancelled and ceased trading, a distribution large enough to trigger application of Rule 11140(b)(2). (Plan § X.G, attached as Exhibit A to Confirmation Order, attached as **Exhibit 2** to the Klein Decl.)[2] Pursuant to Rule 11140(b)(2) (with other applicable UPC provisions, Klein Decl. **Exhibit 3**), the ex-date for large shareholder distributions

---

[2] The Plan did not distribute liquidating trust interests (as is ordinarily done in liquidating chapter 11 cases) to shareholders, meaning distributions to shareholders are being made on account of shares held on or before the date shares were cancelled and ceased trading. Rather, the Plan contemplated the transfer of all of the Debtors' assets to a liquidating trust, and the distribution by the Liquidating Trustee of the trust res directly to shareholders.

2

(25% or more of the share price) is the first business day after the payable date. Thus, under the rule the Initial Equity Distribution should have been paid to shareholders as of COB on October 11, the last business day the Debtors' shares traded before the Rule 11140(b)(2) ex-date. So should any subsequent distribution large enough to trigger application of the rule.

However, when the Initial Equity Distribution was made, FINRA abandoned its responsibility for setting an ex-date for OTC securities. As a result, when the Liquidating Trustee paid the Initial Equity Distribution to DTC through the stock transfer agent, DTC lacked explicit instructions from FINRA as to which date was the ex-date. FINRA's "daily list" notice for the distribution made clear it was large enough to trigger application of Rule 11140(b)(2), but still left the ex-date field blank and was never updated. A cursory look at the public record would have revealed Rule 11140(b)(2) applied, meaning the ex-date should have been the business day that followed the payable date, but DTC either did not bother looking or purposely ignored the fact that this was a large distribution, and instead made the Initial Equity Distribution to shareholders as of COB on August 25, thereby setting a de facto August 26, 2016 ex-date.

Although the Initial Equity Distribution was plainly made to the wrong shareholders, neither FINRA nor DTC have acknowledged as much, and indeed, their responses to shareholder inquiries suggest the error will be repeated with respect to future distributions. (Klein Decl. **Exhibit 4** and **Exhibit 5**.)

As a result, Plaintiff commenced this action to obtain declaratory judgments to ensure the approximately $18 million left to distribute is paid to shareholders in the manner required by Rule 11140(b)(2) and DTC's interim accounting procedures, and sought preliminary relief to ensure the wrong shareholders are not paid during this action's pendency.

**ARGUMENT**

The preliminary injunction should issue because Plaintiff can show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).

I.   **PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS**

   A.   **FINRA is Required to Set an Ex-Date in Accordance with Rule 11140(b)**

FINRA is an SEC-registered national securities association and thus a self-regulatory organization ("SRO") under the Exchange Act. 15 U.S.C. § 78c(a)(26). FINRA is required to comply with "its own rules" and the SEC must approve the same and interpretations thereof prior to their implementation. 15 U.S.C. § 78s(b), (g).

The UPC prescribes rules FINRA employs to regulate the conduct and handling of OTC securities transactions, including regulation of the ex-date for distributions and other corporate actions under Rule 10b-17 under the Exchange Act.

The scope of the UPC with regard to OTC securities is comprehensive. As provided in FINRA Rule 11100(a), the UPC covers "[a]ll over-the-counter secondary market transactions in securities … between members, including the rights and liabilities of the members participating in the transaction, and those operational procedures that affect the day-to-day business of members." *See also* FINRA Bylaws Article IV § 3 (together with other applicable Bylaw provisions, Klein Decl. **Exhibit 6**) ("All over-the-counter transactions in securities by members … are subject to the provisions of the Uniform Practice Code … unless exempted therefrom by the terms of the Uniform Practice Code"); *Am. Benefits Group, Inc. v. NASD*, No. 99-cv-4733, 1999 WL 605246,

4

at *2 (S.D.N.Y. Aug. 10, 1999) (the "NASD [FINRA's predecessor] is responsible for the regulation of the … over-the-counter securities markets").

The UPC and Rule 10b-17 together set clear guidelines for the fixing of an ex-date for distributions by OTC issuers on account of shares owned. Pursuant to Rule 10b-17(b), an OTC issuer must give at least ten days' prior written notice to FINRA of, among other things, the record date, payable date, and distribution amount, each of which is selected by the issuer. FINRA is then responsible for setting an ex-date based on that information in accordance with Rule 11140(b). Pursuant to Rule 11140(b)(1), if the per-share distribution is under 25% of the share price, the ex-date is the second business day before the record date. Pursuant to Rule 11140(b)(2), if the per-share distribution is greater than that amount the ex-date is the first business day after the payable date. In short, the issuer sets the record and payable date, but FINRA must set the ex-date.

Despite the UPC's plain language, FINRA abandoned its responsibility for setting an ex-date with respect to the Initial Equity Distribution and later disclaimed responsibility for having to do so on the grounds that the Debtors' shares ceased trading prior to the distribution and were cancelled under the Plan.

However, nothing in the UPC absolves FINRA from having to set an ex-date for liquidating shareholder distributions, which plainly qualify as "secondary market transactions" under Rule 11100(a) given they are made on account of shares, not liquidating trust interests (note 2, *supra*). *See also In re NASD*, Exchange Act Rel. No. 37538, 62 SEC Docket 1346 (Aug. 8, 1996) ("The Exchange Act requires the NASD, as a self-regulatory organization, to comply with, and vigorously enforce, in an evenhanded and impartial manner, the provisions of the Exchange Act, the rules and regulations thereunder, and its own rules, in carrying out its role as the entity

responsible for [market] oversight").³ That Rule 11140's application would result in a distribution to holders of shares other than on the Distribution Record Date set by the Plan is of no matter. *See In re Arctic Glacier Int'l, Inc.*, No. 15-ap-51732, 2016 WL 3920855, at *7 (Bankr. D. Del. July 13, 2016) ("The Plan's and the UPC 11140's respective allocations will coincide or differ depending on the size of the distribution," and discussing how the rule's application can affect which shareholders receive a distribution under liquidating plan approved under Canadian insolvency law).

Moreover, any cancellation of shares under the Plan was expressly overridden by Paragraphs 15 and 48 of the Confirmation Order, which provide cancellation was for purposes *other than* effecting distributions and controls to the extent the Plan is in conflict with such provision.

Further, FINRA is *not* due any deference in interpreting its rules. *Morgan Keegan & Co. v. Johnson*, No. 2:11-cv-502, 2011 WL 7789796, at *7 (E.D. Va. Dec. 22, 2011) ("FINRA's interpretation of [its] Rule[s] is not due the deference accorded to agency interpretations of congressionally delegated rulemaking").

B. **Rule 11140(b)(2) Applies to Any Distribution as to Which DTC Sets the Ex-Date, and DTC is Required to Follow Interim Accounting Procedures in Making Any Such Distribution**

DTC is an SEC-registered clearing agency, and therefore also an SRO that must comply with "its own rules." *See also* SEC Release No. 47978, 2003 WL 21288541, at *6 (June 4, 2003) (discussing DTC's operations and regulation).

---

³ The release is available online at https://www.sec.gov/litigation/admin/3437538.txt (last visited March 22, 2017).

DTC Rule 1 provides the contents of its Service Guides are "Procedures" under its Rules. DTC Rule 27, in turn, provides "[e]ach Participant and [DTC] shall be bound by such Procedures." (Klein Decl. **Exhibit 7**.)

The Dividends and Distributions Service Guides (Klein Decl. **Exhibit 8** and **Exhibit 9**) provide for application of interim accounting procedures where Rule 11140(b)(2) applies. Interim accounting procedures, in turn, implement the due bill process prescribed by FINRA Rule 11630 where shares trade ex-dividend after the record date. Specifically, both Service Guides explain how the interim accounting procedures operate and explain the reason for the procedures as follows:

> Normally, the registered holder of a security on the close of business on the record date is entitled to the distribution. There are times, however, when that is not the case. There are two common reasons why this could occur:
>
> 1. The registered holder of an equity issue that does not go ex-dividend in the normal way (*for example, if the ex-date is after the record date*) sells the security prior to the ex-date "with distribution." In this case, the buyer is entitled to the distribution.

(*emphasis* added). The Service Guides further state the procedures' purpose is to implement the FINRA Rules without the need for the record date shareholder to manually transfer the distribution to a subsequent purchaser of its shares.

As with the FINRA Rules, DTC is not entitled to deference with respect to interpretation of its Services Guides.

If FINRA does not set an ex-date, then any ex-date would necessarily be set by DTC,[4] as the entity to which the Debtors' transfer agent pays the distribution on its receipt of the same. If

---

[4] DTC has taken the position it does not set ex-dates, only FINRA does. (Klein Decl**. Exhibit 5**.) However, by making the Initial Equity Distribution to shareholders as of COB on a specific date when FINRA had not set an ex-date, DTC necessarily made the ex-date determination itself.

DTC sets the ex-date, it is required to do so in accordance with Rule 11140(b), as its Service Guides expressly contemplate compliance therewith. If DTC were to determine the ex-date in accordance with Rule 11140(b), then Rule 11140(b)(2) would necessarily apply to the remaining distribution by the Trustee, because the remaining distribution ($18 million), when divided into the number of shares the Debtors had outstanding (20.88 million) equals $.86/share, which is much larger than 25% of the closing price on October 11, the last business day on which the Debtors' shares traded ($.15/share). As a result, DTC is required to follow its interim accounting procedures in making such distribution.

### C. Response to Denial of Confirmation Objection

Defendants would argue that the issues raised by Plaintiff were asserted at confirmation, and considered and rejected by the Bankruptcy Court, and it is therefore now too late to seek declaratory relief sought in the Complaint, as no party timely appealed the Confirmation Order and the Plan subsequently became effective.

That argument fails for two reasons.

First, the sole confirmation objection filed (Klein Decl. **Exhibit 10**, without exhibits) stated a *conflict* existed between the Distribution Record Date under the Plan and Rule 11140(b)(2). That is not the case. Nothing would prohibit the Liquidating Trustee from making a future distribution to shareholders as of the Distribution Record Date, and DTC then transferring that distribution to October 11 shareholders by operation of its interim accounting procedures after a Rule 11140(b)-compliant ex-date has been set by FINRA. *See*, *e.g.*, *Arctic Glacier*, quoted *supra*. Accordingly, that the objection was ultimately overruled is irrelevant.

Second, Bankruptcy Judge Brendan L. Shannon expressly acknowledged in his bench decision (Klein Decl. **Exhibit 11**) that notwithstanding Plan confirmation, FINRA is well within

its power to set an ex-date pursuant to Rule 11140(b)(2). Specifically, Judge Shannon stated the objector's investment strategy (buying shares post-August 30) "represents a strategy dependent upon [1] FINRA setting an ex[-]date that was after August 30, or [2] this court denying confirmation." With respect to [1] Judge Shannon stated "the prospect that confirmation would frustrate a risky investment strategy is not a reason to deny confirmation." With respect to [2], Judge Shannon stated:

> I have taken the opportunity to study the authorities presented by the objector in the time since the hearing, and I conclude that these decisions do not compel a different result. The fact that this case is pre-confirmation, or was until later today, does not change the Court's determination that:
>
> <u>one</u>, FINRA has not itself set an ex[-]date;
>
> <u>two</u>, the plan and the disclosure statement set and clearly identified the record date and the mechanics for distribution; and
>
> <u>three</u>, finally, that this inquiry is governed by the provisions of the Bankruptcy Code and the Bankruptcy Rules.

The underlined justifications for his conclusion with respect to [2] (quoted above) are correct, did not present appealable issues, and do not now permit Defendants to deviate from their obligation to follow their own rules pursuant to 15 U.S.C. § 78s(g):

(1) <u>FINRA Had Not Itself Set an Ex-Date</u>. It is certainly true no ex-date had been set for the Initial Equity Distribution as of the date of the bench decision, September 23, 2016, notwithstanding the fact that the daily list notice for the distribution had been posted earlier that month.

(2) <u>The Plan and Disclosure Statement Set and Clearly Identified the Record Date and the Mechanics for Distribution</u>. The mechanics for distribution referred to by Judge Shannon are Paragraph 20 of the Confirmation Order, Section X.J of the Plan attached to the Confirmation Order, and Section 9.1 of the Liquidating Trust Agreement attached to the Plan, all

9

of which provide, in substance, that the Liquidating Trustee is entitled to recognize and make distributions to "Holders" as of COB on August 30, as reflected in the books and records of the Debtors' transfer agent. The books and records of the Debtors' transfer agent, in turn, identify Cede & Co., as DTC's nominee, as the record holder of the Debtors' shares, and do not identify the vast majority (if any) of beneficial owners. Indeed, that is why the Plan requires that distributions be made "through" the transfer agent, which, unlike the Liquidating Trustee, can affect distributions to shareholders through DTC. DTC's implementation of interim accounting procedures as contemplated by its guides in accordance with a Rule 11140(b)-compliant ex-date set by FINRA would not contravene the Plan at all: the distribution would be made to Cede & Co., as nominee, which would then be transmitted to the August 30 shareholders through DTC's participants. It would not be until two business days following the ex-date, on the due bill settlement date, when the funds would be pulled out of record date shareholders' accounts and then transferred to the accounts of October 11 shareholders by operation of the FINRA Rules and interim accounting procedures. However, that later transfer is entirely consistent with the Plan's distribution provisions, as it is administered after the Plan distribution to record date shareholders has been completed, and is therefore not a collateral attack on the Plan.

(3) <u>The Inquiry is Governed by the Provisions of the Bankruptcy Code and Rules</u>. By this, Judge Shannon simply stated application of Rule 11140(b)(1) or (b)(2) has nothing to do with whether the Plan satisfies applicable confirmation requirements. That is correct as a matter of law.

In other words, Judge Shannon recognized there were two avenues for the objector to achieve his desired result: FINRA setting a post-August 30 ex-date *or* denial of confirmation. Judge Shannon did not address the former point (which is the subject of this action), and as to the

latter Judge Shannon reached conclusions that Plaintiff does not dispute and which did not present appealable issues. Plaintiff simply requests that this Court declare that FINRA and DTC are required to follow their own rules and procedures with respect to future distributions under the Plan, which FINRA and DTC should have done with respect to the Initial Equity Distribution notwithstanding the Plan's effective date and cancellation of the Debtors' shares.

## II. PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF

Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999), cited approvingly in *Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*, 446 Fed. Appx. 453 (3d Cir. 2011).

Irreparable harm exists here because FINRA's and DTC's (incorrect as a legal matter) post-hoc justifications for failing to enforce Rule 11140(b)(2) or apply interim accounting procedures with respect to the Initial Equity Distribution—that FINRA was not required to set an ex-date because the shares stopped trading and were cancelled under the Plan, and that DTC simply followed the Plan in effecting the distribution—would apply with equal force to any future distribution. Moreover, even though many shareholders have written to FINRA and DTC concerning this issue, neither of them has admitted it goofed with respect to the Initial Equity Distribution and promised the error would be corrected for any future distribution. Accordingly, if the Liquidating Trustee distributes the balance of the trust *res* before a final determination on the merits of this action and without preliminary relief in place, it is highly likely the same errors which resulted in the Initial Equity Distribution being paid to the wrong shareholders will be repeated.

11

Plaintiff would also suffer irreparable harm as it has no meaningful recourse against FINRA or DTC for making a distribution other than in accordance with Rule 11140(b) or the interim accounting procedures, as both entities are completely immune from suits for monetary damages. *See*, *e.g.*, *Standard Inv. Chartered, Inc. v. NASD*, 637 F.3d 112, 115 (2d Cir. 2011) (FINRA immune from suits for damages relating to discharge of its regulatory responsibilities); *Barbara v. New York Stock Exchange, Inc.*, 99 F.3d 49, 58 (2d Cir. 1996) (SRO is "absolutely immune from damages claims arising out of the performance of its federally-mandated conduct").

Plaintiff likewise has no recourse against shareholders that receive any distribution as a result of FINRA's and DTC's failure to apply their own rules, and cannot identify the universe of such shareholders given the nature of public securities.

## III. THE BALANCE OF EQUITIES TIPS IN PLAINTIFF'S FAVOR

If another distribution were made by the Liquidating Trustee while this action is pending and Plaintiff's motion for preliminary relief were denied, it is highly likely FINRA would again fail to set an ex-date and DTC would again set a de facto August 26 ex-date and fail to apply its interim accounting procedures with respect thereto. As a result, October 11 shareholders would be deprived of their legal right to a distribution under Rule 11140(b) and left with no recourse against the parties that received or were responsible for the improper distribution. In contrast, if this Court granted Plaintiff's motion, the only parties that would conceivably be harmed are shareholders as of COB on August 25 (or 30) that subsequently sold their shares, whose distributions would be delayed pending entry of a final judgment. Significantly, however, such shareholders would only be harmed if this Court determines Plaintiff is wrong on the merits and they are entitled to future distributions under applicable rules and procedures, as opposed to

October 11 shareholders.[5] In short, there can be little doubt the potential harm associated with a distribution to the wrong shareholders that cannot be unwound and as to which no recourse is available far outweighs the harm associated with a delayed distribution.

## IV. AN INJUNCTION IS IN THE PUBLIC INTEREST

FINRA's mandate is to protect investors and promote market integrity.[6] The manner in which the Initial Equity Distribution was made undermined market integrity because it deprived post-August 25 purchasers that held their shares through October 11 of their legal right to an $8 million distribution under the FINRA Rules. Denying Plaintiff's motion for preliminary relief risks further undermining market integrity, with more than double that amount at stake.

## V. RULE 65(c)'S SECURITY REQUIREMENT SHOULD BE WAIVED

Rule 65(c) provides a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The only "party" Plaintiff seeks to enjoin is DTC, which would not be harmed by the preliminary relief sought by Plaintiff as it did not beneficially own the Debtors' shares at any time. Moreover, the only nonparties that would be affected by the relief are shareholders that sold their shares post-August 25 (or 30), whose distributions would be delayed, if this Court ultimately decides they are entitled to future distributions.

---

[5] Moreover, any delay associated with preliminary relief would likely be minimal because the key issues in this action are legal, not factual.

[6] *See*, *e.g.*, http://www.finra.org/industry/market-regulation ("FINRA's Market Regulation department oversees and regulates over-the-counter (OTC) trading … for compliance with FINRA rules … Key to FINRA's mandate to maintain market integrity is effective, even-handed regulation, which protects investors and other market participants and enhances investor confidence in the markets"); http://www.finra.org/industry/rules-and-guidance ("As part of its mandate to protect investors and promote market integrity, FINRA enacts rules …").

13

## **CONCLUSION**

For the foregoing reasons, this Court should enter an order (1) enjoining DTC from setting an official or unofficial ex-date for any distribution to holders of shares in DNIB Unwind, Inc., or effecting any such distribution through DTC's participants, pending entry of a final judgment on Plaintiff's claims herein; and (2) waiving Rule 65(c)'s security requirement.

                                                         Respectfully submitted,

Dated: March 23, 2017                         KLEIN LLC
       Wilmington, Delaware

                                                       */s/ Julia Klein*
                                                       Julia B. Klein (DE 5198)
                                                       919 North Market Street
                                                       Suite 600
                                                       Wilmington, Delaware 19801
                                                       (302) 438-0456
                                                       klein@kleinllc.com

                                                       *Attorneys for Plaintiff*
                                                      *and the Putative Class*