IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

B.E. CAPITAL MANAGEMENT FUND LP,  )
on behalf of itself and all others similarly  )
situated,  )
  )
           Plaintiff,  )
  )
        v.  )    Case No. 17-00311 (GMS)
  )
FINANCIAL INDUSTRY REGULATORY  )
AUTHORITY, INC. and THE DEPOSITORY  )
TRUST COMPANY,  )
  )
          Defendants.  )

**DEFENDANT THE DEPOSITORY TRUST COMPANY'S ANSWERING BRIEF
IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
AND OPENING BRIEF IN SUPPORT OF ITS CROSS-MOTION TO DISMISS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
R. Judson Scaggs, Jr. (#2676)
Donna L. Culver (#2983)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rjscaggs@mnat.com
dculver@mnat.com
  *Attorneys for Defendant The Depository
  Trust Company*

OF COUNSEL:

Gregg M. Mashberg
Proskauer Rose LLP
Eleven Times Square
New York, NY  10036-8299

April 25, 2017

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

NATURE AND STAGE OF THE PROCEEDING ...................................................... 1

SUMMARY OF THE ARGUMENT ......................................................................... 1

STATEMENT OF FACTS ....................................................................................... 4

ARGUMENT ....................................................................................................... 11

    I.       LEGAL STANDARD ON A MOTION TO DISMISS. ..................................... 11

    II.      THIS ACTION IS MOOT. ................................................................... 12

    III.    DTC IS IMMUNE FROM THE CLAIMS ASSERTED IN THE
           COMPLAINT AND ITS ACTIONS ARE PRIVILEGED. .................................. 12

    IV.    PLAINTIFF HAS NEITHER IDENTIFIED ANY DTC RULE
           THAT DTC HAS ALLEGEDLY VIOLATED, NOR EVEN HAD
           IT DONE SO, WOULD IT HAVE A PRIVATE RIGHT OF
           ACTION TO CHALLENGE AN ALLEGED BREACH OF
           DTC'S RULES. ................................................................................. 14

           A.      Plaintiff Has Not and Cannot Identify Any DTC Rule or
                  Procedure That DTC Has Violated. ....................................................... 14

           B.      Plaintiff Does Not Have a Private Right Of Action to
                  Challenge DTC's Application of Its Own Rules and
                  Procedures. ...................................................................................... 16

    V.      PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY
           INJUNCTION. .................................................................................. 17

CONCLUSION .................................................................................................... 20

## TABLE OF AUTHORITIES

Page(s)

Cases

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................ 11, 12, 15, 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................ 11, 15

*Bloch v. Prudential-Bache Sec.*,
    707 F.Supp. 189 (W.D. Pa. 1989) ............................................................ 17

*Dexter v. Depository Trust &Clearing Corporation*,
    406 F.Supp.2d 260 (S.D.N.Y. 2005), *aff'd* 219 Fed.Appx.91 (2d Cir. 2007) ........... 12, 13, 14

*In re DNIB Unwind, Inc. (f/k/a BIND Therapeutics, Inc.) et al.*,
    Case No. 16-11084 (BLS) ......................................................................... 2

*Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*,
    765 F.3d 205 (3d Cir. 2014) ..................................................................... 17

*Gallier v. Woodbury Fin. Servs.*,
    2015 WL 1296351 (S.D. Tex. Mar. 23, 2015) ........................................... 17

*Huntley v. Chi. Bd. of Options Exch.*,
    161 F.Supp.3d 612 (N.D. Ill. 2015) .......................................................... 13

*MM&S Fin., Inc. v. NASD, Inc.*,
    364 F.3d 908 (8th Cir. 2004) .................................................................... 17

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ....................................................................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................. 5

Statutes and Other Authorities

15 U.S.C. § 78c(a)(26) ................................................................................. 4

15 U.S.C. § 78q-1(b) ................................................................................... 5

15 U.S.C. §§ 78q-1, *et seq.* ........................................................................ 4

15 U.S.C. § 78s(b)(1) ................................................................................. 4, 6

TABLE OF AUTHORITIES (continued)

Page(s)

15 U.S.C. § 78s(g) ........................................................................................................4, 15

Fed. R. Civ. P. 12(b)(6) ..................................................................................................5, 11

FEDERAL RULE OF EVIDENCE 201(b) ..............................................................................10

New York Uniform Commercial Code § 8-102(a)(5)(i) ..............................................4

New York Uniform Commercial Code § 8-102(a)(14)(i) ...........................................4

Securities Exchange Act of 1934 § 17A ......................................................................4

*Shortened Settlement Cycle Research Center*, SECURITIES INDUSTRY AND
    FINANCIAL MARKETS ASSOCIATION ......................................................................9

*In re The Depository Trust Co.*, Exchange Act Release No. 34–47978, 2003 WL
    21288541 (June 4, 2003) ........................................................................................5

UCC § 8-505(b) ............................................................................................................6

UPC Rule 11140(b) .......................................................................................................7

UPC Rule 11140(b)(1) ..................................................................................................8

Wright & Miller § 1357 .................................................................................................6

## NATURE AND STAGE OF THE PROCEEDING

This is a purported action for declaratory relief filed by B.E. Capital Fund LP, ("Plaintiff" or "BEC"), on behalf of itself and others similarly situated.  By its Verified Complaint[1] filed March 22, 2017, Plaintiff seeks a declaration compelling defendants Financial Industry Regulatory Association ("FINRA") and The Depository Trust Company ("DTC") to take certain actions that would have the effect of including Plaintiff and the putative class in any upcoming distribution of cash to shareholders of DNIB Unwind, Inc. ("DNIB").  As concerns DTC, Plaintiff also seeks a preliminary injunction restraining DTC from setting an ex-dividend date ("ex-date") (explained below) for future distributions, even though Plaintiff admits that FINRA has the regulatory authority for setting ex-dates and determined not to do so in this case. Plaintiff also seeks to restrain DTC from processing any future DNIB distribution during the pendency of this action.  As demonstrated below, the request for a preliminary injunction should be denied and the Complaint dismissed as against DTC.

## SUMMARY OF THE ARGUMENT

1.      DNIB is in bankruptcy and its combined disclosure statement and liquidation plan (the "Plan") provides for cash distributions to be made to holders of DNIB as of August 30, 2016, defined as the "Distribution Record Date."  VC ¶ 23(a).  The Plan describes the first cash distribution as the "Initial Equity Distribution," which, according to a Form 8-K filed on August 30, would "*only*" be paid to "beneficial owners of the shares as of the COB on the

---

[1]      The Verified Complaint (D.I. 1) is referred to as the "Complaint" or the "VC."  Plaintiff's "Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction" (D.I. 4) is referred to as, "Pl. PI Mem."  The Declaration of Julia B. Klein (Plaintiff's counsel) and the exhibits annexed thereto (D.I. 4-1) is referred to as, "Klein Decl. Ex. ___."

Distribution Record Date, and not persons who purchase shares thereafter." VC ¶ 24 (emphasis in VC).[2]

Despite the language of the Plan and the Form 8-K, Plaintiff purchased certain DNIB shares on September 1, 2016, the day *after* the Distribution Record Date. VC ¶ 9. Whatever the rationale for this investment strategy, it apparently did not work as Plaintiff complains that it did not receive any distribution from the Initial Equity Distribution (which was made in December 2016) with respect to its DNIB shares purchased after August 30. VC ¶¶ 8, 16-17. Plaintiff has brought this action to forestall the same thing from happening with respect to the next distribution. VC ¶ 57.

Notably, in confirming the Plan, the Bankruptcy Court expressly rejected an objection by another investor who argued, as Plaintiff does here, that FINRA should have set an ex-date that would have resulted in Plaintiff sharing in distributions with respect to DNIB shares purchased after the Distribution Record Date. Despite the Bankruptcy Court's rejection of this objection and the express language of the confirmed Plan that precludes Plaintiff's claim, Plaintiff nonetheless continues to seek to vindicate its investment strategy in this Court by requesting preliminary and declaratory relief designed to ensure that it (and the putative class) will receive future distributions with respect to shares purchased after the Distribution Record Date. *Id.*

---

[2]     *See In re DNIB Unwind, Inc. (f/k/a BIND Therapeutics, Inc.) et al.*, Case No. 16-11084 (BLS) (Bnkr. D. Del.). The Bankruptcy Court confirmed the Plan on September 26, 2016, and the Plan became effective. VC ¶¶ 25-26; Klein Decl. Ex. 2. FINRA's memorandum of law in support of its motion to dismiss, filed on April 25, 2017 ("FINRA Mem."), describes DNIB's bankruptcy cases as relevant to this action. DTC adopts and incorporates this discussion by reference, as well as other portions of the FINRA Mem., as referenced below.

2.     The Initial Equity Distribution was processed through DTC on December 20, 2016.  VC ¶¶ 34-36.  DTC, as explained below, is the nation's central securities depository and among the services it provides to the major banks and brokerage houses that constitute its "Participants," it allocates interest, dividends and other distributions to its Participants when issuers of securities engage in such corporate actions.  In this case, DTC allocated the Initial Equity Distribution to its Participants according to the Plan; *i.e.*, to those Participants whose DTC accounts reflected interests in DNIB shares as of the Distribution Record Date, August 30, 2016.  VC ¶ 36.

Plaintiff alleges that DTC should not have used the Distribution Record Date in allocating the Initial Equity Distribution, despite the requirements of the Plan, and should not do so in the future.  In the absence of action by FINRA, Plaintiff seeks to compel DTC to act on its own to set an ex-date favorable to Plaintiff's investment strategy, despite the adverse ruling of the Bankruptcy Court and the absence of any provision of DTC's Rules or Procedures that would authorize DTC to do so.

3.     Moreover, FINRA has demonstrated that it is absolutely immune from the claims asserted against it in this action.  As recognized in case law, DTC, as a clearing agency relies on FINRA with respect to FINRA's ex-date determinations.  DTC, therefore, is also immune from any claim that, in the absence of action by FINRA to set an ex-date, DTC was obligated to do so and its actions are privileged in any event.

4.     Finally, even assuming that Plaintiff could identify a DTC Rule or Procedure that DTC allegedly violated in not setting a late ex-date, the complaint must nonetheless be dismissed as there is no private right of action to challenge an alleged breach of DTC's rules.

## STATEMENT OF FACTS

Plaintiff is a Delaware limited partnership that allegedly purchased certain DNIB shares before the Distribution Record date and made additional purchases on September 1, 2016, one day after the Distribution Record Date.  VC ¶ 9.  Plaintiff alleges that the Plan, originally proposed on August 15, 2016 (VC ¶ 22), provided that holders as of the August 30 Distribution Record Date, would receive the distribution (VC ¶ 23(a)), and a Form 8-K filed on August 30 provided that "only" holders as of that date would receive distributions (VC ¶ 24).  Nonetheless, according to the Complaint, Plaintiff determined to make its second purchase of DNIB stock one day *after* the distribution cut-off date.  VC ¶ 9.

DTC is the nation's central securities depository and registered with the U.S. Securities and Exchange Commission ("SEC") as a clearing agency pursuant to Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act");[3] *see also* VC ¶ 11 (purporting to quote an SEC description of DTC).  DTC is also a "clearing corporation" and "securities intermediary" as defined by New York Uniform Commercial Code ("UCC") § 8-102(a)(5)(i) and § 8-102(a)(14)(i), respectively.

As a clearing agency registered with the SEC, DTC is also a Self-Regulatory Organization ("SRO") pursuant to 15 U.S.C. § 78c(a)(26).  As an SRO, DTC is obligated to promulgate rules governing its activities.  15 U.S.C. § 78s(b)(1).  These rules are subject to approval by the SEC.  *Id.* at (b)(2).  As an SRO, DTC is obligated to comply with the Exchange Act, SEC regulations, "and its own rules."  15 U.S.C. § 78s(g); *see also* Pl. PI Mem. at 6 (same).

Utilizing automated systems for the "book-entry" (computerized) movement of interests in securities, DTC operates a centralized system for handling securities deposited at

---

[3]     *See* 15 U.S.C. §§ 78q-1, *et seq.*

DTC by the brokers and banks that constitute its "Participants."  15 U.S.C. § 78q-1(b); *In re The Depository Trust Co.*, Exchange Act Release No. 34–47978, 2003 WL 21288541 (June 4, 2003). Securities deposited at DTC for book-entry services are registered on the issuer's books in the name of DTC's nominee, Cede & Co., making Cede & Co. the registered (legal) owner of the deposited securities.  Participants whose DTC securities accounts are credited with the deposited securities have beneficial ownership interests.  Thus, purchases and sales of deposited securities between and among Participants are "settled" at DTC by book-entry debits and credits to Participants' DTC accounts, while Cede & Co. remains the registered (legal) owner. "Immobilizing" deposited securities at DTC in this fashion avoids the need to change record ownership to settle changes in beneficial ownership, thereby facilitating the enormous trading volumes that characterize the modern securities marketplace.  *See* VC ¶ 11.

Among the myriad functions DTC performs as the nation's central securities depository, are the services at issue in this case:  allocation of cash distributions to its Participants with respect to securities that Participants have deposited at DTC.  This distribution service is described in DTC's "Distributions Service Guide," which constitutes "Procedures" of DTC as defined in DTC Rule 27, and relied upon by Plaintiff.  *See* Pl. PI Mem at 7 (same); Klein Decl. Ex. 9 (*see also* Klein Decl. Ex. 8 (Dividends Service Guide)).[4]  DTC's Procedures are, along with DTC's Rules, subject to approval by the SEC.[5]

---

[4]      *See Rules and Procedures*, DEPOSITORY TRUST & CLEARING CORPORATION, http://www.dtcc.com/legal/rules-and-procedures.  The Complaint alleges that DTC failed "to abide by its own rules and procedures" (¶ 1), refers to the Distribution Service Guide (¶ 18), and thus DTC is entitled to rely on these documents in opposing plaintiff's motion for a preliminary injunction and in support of DTC's cross-motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated
(Continued . . .)

In brief, when an issuer (through its agent) makes interest, dividend or other distributions with respect to securities deposited at DTC, the payment is made to Cede & Co. (DTC) as the registered (legal) owner of the security. DTC, in turn, then allocates the funds on a *pro rata* basis to its Participants, who are the beneficial interest holders. (Participants, in turn, allocate the proceeds to their respective customers.) *See* UCC § 8-505(b) ("A securities intermediary [DTC] is obligated to its entitlement holder [*e.g.*, DTC's Participants] for a payment or distribution made by the issuer of a financial asset if the payment or distribution is received by the securities intermediary").

In allocating distributions to its Participants, DTC's Rules and Procedures provide that it will make distributions based upon the "record date" set by the issuer in announcing the distribution: "Using a record date ensures that holders are able to receive cash or other distributions . . . based upon their holdings a set point in time. A record date is also required to determine the Participant and ultimately the beneficial owner entitled to receive distributions and or rights." DTC Operational Arrangements, III.A. (p.19);[6] *see also* VC ¶ 14.

---

(. . . continued)

   into the complaint by reference, and matters of which a court may take judicial notice.") (citing Wright & Miller § 1357 ("Numerous cases, as the note below reflects, have allowed consideration of matters incorporated by reference or integral to the claim, items subject to judicial notice . . . without converting the motion into one for summary judgment")); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (same).

[5]   *See*, *e.g.*, Self-Regulatory Organizations: The Depository Trust Company; Notice of Filing and Immediate Effectiveness of Proposed Rule Change to Harmonize and Clarify Language Within the DTC Service Guides Regarding Restrictions on the Use of Information and Data Distributed by DTC, SEC Release No. 34-69866, File No. SR-DTC-2013-07 (June 27, 2013) (reflecting submission of Service Guide amendments to SEC for approval pursuant to 15 U.S.C. § 78s(b)(1)).

[6]   DTC's Operational Arrangements form part of its SEC-approved Procedures. They are available at http://www.dtcc.com/matching-settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc.

It is typically the case that the record date set by the issuer is accompanied by an "ex-date," which is the date on which all shares purchased on or after such date will not receive the upcoming announced distribution.  VC ¶14(c).  DTC does not set ex-dates, and there is no provision of its Rules and Procedures that give it the responsibility or authority to do so.  Nor does plaintiff cite to any.  Rather, the ex-date is "established and announced by the applicable stock exchange on which the security is listed (e.g., NYSE, NASDAQ)."  DTC Operational Arrangements at III.A.4. (p. 19); *see also*, *e.g.*, SEC, *Ex-Dividend Dates: When Are You Entitled to Stock and Cash Dividends* ("Once the company sets the record date, the ex-dividend date is set based upon *stock exchange rules*" (emphasis added))[7].  Indeed, as applicable to the security at issue in this case, the Complaint acknowledges that "FINRA is responsible for setting an ex-date . . . for distributions of over-the-counter ("OTC") securities in accordance with Rule 11140(b) of its Uniform Practice Code (the "UPC")."  VC ¶ 2.  The Complaint goes on to describe in great detail and quote from the UPC regarding FINRA's setting of ex-dates.  *See*, *e.g.*, VC ¶¶ 5, 6, 14, 17 and 18.  Thus, in carrying out its responsibilities with respect to allocating distributions, DTC relies on other SROs – in this case, FINRA – to set (or not set) ex-dates in accordance with their own rules.  *See also* FINRA Mem. at 4-5.

As alleged in the Complaint (VC ¶¶ 5-6), in the ordinary case the ex-date set by FINRA is two days before the record date.  *Id.* quoting FINRA Rule 11140(b)(1).  However, when the distribution exceeds 25% of the value of the issuer, the ex-date set by FINRA is the first business day after the date that the issuer makes the distribution (a "late ex-date").  VC ¶ 17 (citing FINRA Rule 11140 (b)(2)); *see also* FINRA Mem. at 4-5.  The late ex-date may be weeks

---

[7]      Available at https://www.sec.gov/fast-answers/answers-dividenhtm.html.

or months after the record date, meaning that, where a late ex-date is set, investors who made their purchases after the record date will still be entitled to the distribution.

In this case, the Complaint alleges that FINRA did not set any ex-date for the "Initial Equity Distribution," which occurred in December 2016.  Plaintiff alleges that "FINRA abandoned its responsibility for setting the ex-date."  VC ¶¶ 4, 38; *see also* VC ¶ 33 ("FINRA never set an ex-date for the Initial Equity Distribution.").  Plaintiff alleges that "FINRA disclaimed responsibility for having to set an ex-date because the shares were cancelled pursuant to the Plan and ceased trading on October 11, over two months before the Initial Equity Distribution."  VC ¶ 40; *see also* FINRA Mem. at 5.

According to Plaintiff, because the funds being distributed exceed 25% of the value of DINIB, FINRA should have set a late ex-date for the Initial Equity Distribution, which would have resulted in the shares Plaintiff purchased after the Distribution Record Date being included in the Initial Equity Distribution.  VC ¶ 39.  While Plaintiff does not seek any relief regarding the Initial Equity Distribution (VC ¶ 8), it seeks preliminary and declaratory relief against DTC and declaratory relief against FINRA to require a late ex-date to be set for any future distribution.  VC ¶¶ 57-58.

Despite having conceded that only FINRA is authorized to set ex-dates for DNIB stock, that FINRA did not do so, and that "DTC lacked instructions from FINRA as to whether the distribution should be made to shareholders in accordance with [UPC] Rule 11140(b)(1) or (b)(2)" (VC ¶ 5), the Complaint makes entirely conclusory and unsubstantiated allegations that *DTC* was responsible for setting an ex-date in the absence of action by FINRA and did, in fact, do so:

> DTC "fail[ed] . . . to abide by its own rules and procedures" (VC. ¶ 1);

- 8 -

> DTC "set[] a *de facto* August 26, 2016 ex-date" (VC ¶ 6);
>
> "[t]he distribution was based on an August 26 ex-date that [DTC] set. . ." (VC ¶ 36); and
>
> "DTC should have ensured that a [UPC] Rule 11140(b)-compliant [late] ex-date was set before $8 million was distributed without FINRA having specified which ex-date applied . . . . However, as noted above it effected the distribution based on an August 26 ex-date" (VC ¶ 43).

Plaintiff's allegations that DTC set an ex-date and, at that, set the wrong ex-date, are not based on any written or oral communication from DTC or FINRA.  Nor does plaintiff cite to any of DTC's publicly available Rules and Procedures that Plaintiff alleges DTC violated by not setting a late ex-date in the absence of action by FINRA.  Rather, Plaintiff apparently surmises that DTC set August 26 as the ex-date, despite having no authority under its Rules and Procedures to do so, because investors who purchased DNIB shares after August 26; *i.e.,* less than three trading days before the Distribution Record Date of August 30, did not receive the distribution.  VC ¶¶ 6, 36.

Plaintiff's conclusory assertion that DTC set an ex-date is not plausible.  The obvious explanation as to why DTC did not allocate the distribution to its Participants who purchased shares on behalf of customers such as Plaintiff after August 26 is simple: it takes three days after a securities trade for the transaction to settle by recordation in the DTC accounts of DTC's Participants.[8]  Thus, trades that occurred after August 26 would not have settled and

---

[8]    The three day settlement cycle is commonly referred to as "T+3".  *See*, *e.g.*, *Shortened Settlement Cycle Research Center*, SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION, available at http://www.sifma.org/issues/operations-and-technology/shortened-settlement-cycle/overview/ ("T+3 is settlement – the delivery of securities to net buyers and payments of money to net sellers.  Broker/dealers instruct their settling banks to send or receive funds (through the Federal Reserve System) to/from the Depository Trust Company (DTC) as NSCC's agent. Securities generally do not change hands physically. DTC transfers ownership between broker/dealers' accounts
(Continued . . .)

would not have been recorded in the DTC accounts of DTC's Participants by the Distribution

Record Date, August 30.  Those trades would not be reflected in DTC's books until September 1

or later and would not be included in the distribution based on the August 30 Distribution Record

Date.  Thus, the determination as to who received the distribution had nothing to do with setting

an ex-date, which never happened for this transaction, because FINRA (relying on its ex-date

rules) did not set one.  *See* FINRA Mem. at 5.

        As noted earlier, the precise issue presented to this Court was considered and

rejected by the Bankruptcy Court in confirming the Plan.  In the transcript of proceedings before

the Bankruptcy Court on September 23, 2016 (Klein Decl. Ex. 11), the court explained that

Coleman, a DNIB investor who, like Plaintiff here, purchased DNIB shares after August 30,

objected to the Plan because he was excluded from the distribution as a result of FINRA's

determination not to set a late ex-date.  Klein Decl. Ex. 11 at 7.  Coleman argued, as does

Plaintiff in this case, that his investment strategy was premised on his expectation that either

FINRA would set a late ex-date or the court would deny confirmation, resulting in the

distribution applying to the shares acquired after August 30.  *Id.*  In language directly applicable

to this litigation, the Bankruptcy Court rejected the Coleman objection and confirmed the Plan:

> Mr. Coleman's objection recites that he did an investigation into
> this matter and deliberately purchased the debtors' stock in the
> pink sheets after August 30, 2016.  His decision was apparently
> predicated upon his reading of the FINRA regulations and his
> investment represents a strategy dependent upon either FINRA
> setting an ex date that was after August 30, or this court denying
> confirmation of debtors plan.

---

(. . . continued)
      by book-entry electronic movements.").  Pursuant to FEDERAL RULE OF EVIDENCE 201(b),
      the Court may take judicial notice of the T+3 settlement cycle.

> The record reflects that FINRA has not set an ex date for
> distribution or payments in this case and the Court concludes that
> the treatment of claims and interests in this Chapter 11 case is and
> will be governed by the terms of the plan and the provisions of the
> Bankruptcy Code.
>
> Again, the record reflects that all parties were on notice that
> distributions would be made to holders as of August 30, and not to
> those who acquired interest after that date.

*Id.* at 7-8.  Apparently, Plaintiff did not join in Coleman's objection nor was there any appeal

from the determination of the Bankruptcy Court to confirm the Plan.  *See* FINRA Mem. at 5-6

and 8, n.4.  Nonetheless, this same argument, rejected by the Bankruptcy Court, is the premise

for declaratory relief sought in this litigation.

      As demonstrated below, the Complaint should be dismissed as against DTC and,

accordingly, the motion for a preliminary injunction denied.

<div align="center">ARGUMENT</div>

I.     <u>LEGAL STANDARD ON A MOTION TO DISMISS.</u>

      To survive a Rule 12(b)(6) motion to dismiss,  the complaint must allege "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  By contrast, a pleading that only "offers

'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not

do.'"  *Id*. (quoting *Twombly*, 550 U.S. at 555).  "The plausibility standard . . . asks for more than a

sheer possibility that a defendant has acted unlawfully . . . . Where a Complaint pleads facts that

are *merely consistent* with a defendant's liability, it stops short of the line between possibility

and plausibility of entitlement to relief."  *Iqbal,* 556 U.S. at 678 (internal quotations and citation

omitted) (emphasis added).  Thus, when the alleged facts allow an "obvious alternative

<div align="center">- 11 -</div>

explanation," *id.* at 682 (citation omitted), for the defendant's conduct, then the Complaint

supports no more than the "mere possibility" of an actionable claim, *id.* at 679, and must be

dismissed. Such determinations are to be based on a court's "judicial experience and common

sense." *Id.* "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further

factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

     II.      <u>THIS ACTION IS MOOT.</u>

As FINRA has explained in its motion to dismiss, this action should be dismissed

because BEC's claims are moot.  In order to avoid unnecessary duplication, DTC adopts and

incorporates by FINRA's arguments in support of this motion, as well as in opposition to

Plaintiff's motion for a preliminary injunction.  *See* FINRA Mem. at 8-9.

     III.     <u>DTC IS IMMUNE FROM THE CLAIMS ASSERTED IN THE</u>
             <u>COMPLAINT AND ITS ACTIONS ARE PRIVILEGED.</u>

FINRA has demonstrated that it is absolutely immune from the claims asserted

against it in this action.  *See* FINRA Mem. at 9-11.  As a result, DTC is similarly immune from

any claim that, in the absence of action by FINRA to set an ex-date, DTC was obligated to do so.

*See Dexter v. Depository Trust &Clearing Corporation*, 406 F.Supp.2d 260 (S.D.N.Y. 2005),

*aff'd* 219 Fed.Appx.91 (2d Cir. 2007).

In *Dexter*, the beneficiary of a litigation trust challenged the determination of

FINRA's predecessor, the National Association of Securities Dealers ("NASD"), to issue

instructions that, when coupled with provisions of the UPC governing ex-dates (the same

provision at issue here), ensured that the eventual distribution of proceeds from the trust would

go to those who owned the subject shares as of the date of the distribution, rather than, as

provided in the plan of reorganization, to shareholders as of the plan's effective date.  406

F.Supp.2d at 261-62.  In addition to suing NASD for issuing instructions in alleged violation of

the plan, the plaintiff sued DTC, which, as in this case, had allocated the distribution to its

Participants. *Id.* at 262.

The District Court made quick work of Dexter's claims, ruling that the NASD

was absolutely immune from suit because it was carrying out its regulatory functions:

> The complaint in this case challenges actions taken by the NASD
> in the core exercise of its regulatory functions. Dexter attacks the
> NASD's regulatory decision to set an ex-dividend date for UCFC
> securities; its instructions requiring UCFC shares traded after
> October 31, 2000, to be accompanied by "due bills"; and its
> decision to authorize trades for rights to distributions from the
> Litigation Trust. Regardless of the merits of Dexter's claims with
> respect to the propriety of these decisions, all were clearly
> regulatory decisions squarely covered by the NASD's immunity as
> an SRO.

*Id.*; *see also Huntley v. Chi. Bd. of Options Exch.*, 161 F.Supp.3d 612 (N.D. Ill. 2015) (citing

*Dexter*, 406 F.Supp.2d at 263).

As for DTC, the court in *Dexter* ruled that DTC, in relying on the NASD's

regulatory determinations, was similarly immune from Dexter's claims:

> The NASD's regulatory decisions would be meaningless unless a
> clearing agency such as DTC carried out its directives. DTC's
> actions here were ministerial in nature. It would be illogical to
> clothe the NASD with absolute immunity for its regulatory
> decisions, and then to impose liability on a clearing agent that
> simply carried out its functions in obedience to, and in express
> reliance on, those decisions.

406 F.Supp.2d at 264; *see also Dexter*, 219 Fed.Appx.91 (holding DTC's actions to be

"privileged"). Just as DTC was held to be immune from the claim asserted in *Dexter* because

NASD was immune, it is similarly immune from the claim in this case

The obvious procedural difference between this case and *Dexter*, where here

FINRA is challenged for not setting an ex-date and in *Dexter* the NASD was sued for having

allegedly set an improper ex-date, is a distinction without a difference. FINRA's absolute

immunity in connection with setting an ex-date is no different than its absolute immunity for not setting one. By a parity of reasoning, DTC is similarly immune. It was impossible for DTC to make distributions with respect to DNIB shares based on an ex-date ("late" or otherwise) because FINRA determined that its rules did not allow it to set one, which BEC concedes is within the regulatory purview of FINRA. *See* VC ¶¶ 4, 33, 38, 40. That determination is thus immune from judicial challenge. Since DTC has no authority or obligation under its Rules and Procedures to set an ex-date on its own (see below), the matter is at an end. In this case, as in *Dexter*, DTC "simply carried out its functions, in obedience to" the decision of FINRA not to set an ex-date. *Dexter*, 406 F.Supp.2d at 264. As a matter of law, DTC is immune from any suit requiring it to take action setting an ex-date when FINRA, the regulator with authority for setting ex-dates, is immune from any such claim.

IV.  **PLAINTIFF HAS NEITHER IDENTIFIED ANY DTC RULE THAT DTC HAS ALLEGEDLY VIOLATED, NOR EVEN HAD IT DONE SO, WOULD IT HAVE A PRIVATE RIGHT OF ACTION TO CHALLENGE AN ALLEGED BREACH OF DTC'S RULES.**

A.  **Plaintiff Has Not and Cannot Identify Any DTC Rule or Procedure That DTC Has Violated.**

Although the Complaint contains the conclusory allegation that DTC failed "to abide by its own rules and procedures in effecting" the distributions (VC ¶ 1), Plaintiff fails to identify any DTC Rule or Procedure that actually requires or authorizes DTC to set an ex-date. That is understandable because none exists. Instead, as the Complaint otherwise acknowledges, the setting of ex-dates is a matter entrusted by law to SROs (in this case FINRA). *See supra* at 7-8. Nothing in DTC's Rules or Procedures – all of which are publicly available and, in fact,

attached as exhibits to Plaintiff's declaration in support of its preliminary injunction application[9] – authorizes DTC to engage in activities otherwise relegated to the purview of the regulatory authorities. For DTC to purport to set an ex-date absent authority under its Rules or Procedures would violate its obligation to comply with "its own rules." 15 U.S.C. § 78s(g); *see also* Pl. PI Mem. at 6.

Plaintiff's references to the "Interim Accounting" provisions of DTC's Distribution Service Guide do not change this picture. VC ¶¶ 18, 45(c); Pl. PI Mem. at 6-8; Klein Decl. Ex. 9 at 26. Nothing in the Interim Accounting procedures authorizes or directs DTC to set an ex-date – the issue underlying this litigation. These procedures simply describe the automated service provided by DTC for moving distributions from a Participant who receives a distribution to which it is not entitled because it has sold the security prior to the ex-date to the purchaser who is entitled to the distribution. But the premise for this automated service is that the appropriate regulator *has set an ex-date* that results in the need to move the funds (referred to as "due bills") from the selling broker to the purchasing broker. In this case, however, where FINRA determined that its rules did not allow it to set an ex-date, the Interim Accounting service has no relevance. In other words, simply because DTC provides a service to automate the processing of due bills resulting from ex-dates does not mean that DTC has a responsibility to set ex-dates.

Considered in the context of the *Twombly* and *Iqbal* plausibility analysis, the Complaint does not state a plausible claim that DTC violated its own Rules or Procedures. Not only has Plaintiff failed to identify any DTC Rule or Procedure that *requires or authorizes* DTC to set an ex-date, but the Complaint's allegations that it was incumbent upon FINRA to have set

[9] *See* Klein Decl. Exs. 9-11.

an ex-date in this case (which allegations FINRA has demonstrated are incorrect), contradicts any claim that DTC violated its own rules by not setting a late ex-date. *See supra* at 8-9.  Under these circumstances, the claim that DTC violated its Rules and Procedures lacks "facial plausibility," and "the alleged facts allow an 'obvious alternative explanation," for DTC's conduct, that negate any notion that the Complaint supports more than the "mere possibility" of an actionable claim. *Iqbal*, 556 U.S. at 678, 679, 682.

Additionally, in considering Plaintiff's conclusory allegations that DTC, despite having no authority to set ex-dates, did in fact (erroneously) set an ex-date in this case (*supra* at 9), there is an "obvious alternative explanation" to Plaintiff's claim.  Investors who purchased DNIB shares after August 26 – less than three days before the Distribution Record Date – did not receive the distribution because their trades had not settled at DTC by the Distribution Record Date.  *See supra* at 9-10 and n. 8.  That was not because DTC had set an ex-date of Augusts 26, as Plaintiff alleges; it simply reflects the operation of the existing T+3 securities settlement process.  Under these circumstances, Plaintiff's conclusory claim that DTC set the (wrong) ex-date – in the face of its own allegations that FINRA is the regulator authorized to set ex-dates here and Plaintiff's failure to identify any DTC Rule or Procedure that authorizes DTC to do so – fails *Iqbal's* "plausibility standard." 556 U.S. at 678.[10]

    B.    Plaintiff Does Not Have a Private Right Of Action to Challenge DTC's Application of Its Own Rules and Procedures.

Further, even if Plaintiff could identify a DTC Rule or Procedure that DTC allegedly violated in not setting a late ex-date, which it cannot, the claim that DTC is failing to

---

[10] In the ordinary course, investors who purchased DNIB shares before August 30 but did not receive the distribution because their transactions had not settled by that date would obtain their dividends from the sellers who did.

enforce its own rules (*e.g.*, Pl. PI Mem. at 1) would still be subject to dismissal.  It is a basic tenet of securities law that there is no private cause of action against an SRO (of which DTC is one (*see supra* at 5)) allegedly violating its own rules.  *See MM&S Fin., Inc. v. NASD, Inc.*, 364 F.3d 908, 912 (8th Cir. 2004) (holding no private right of action for breach of a self-regulatory organization's rules); *Gallier v. Woodbury Fin. Servs.*, 2015 WL 1296351, at *7 (S.D. Tex. Mar. 23, 2015) (same); *Bloch v. Prudential-Bache Sec.*, 707 F.Supp. 189, 196 (W.D. Pa. 1989) ("third party beneficiary liability seems incongruous with the large body of case law holding that no private cause of action exists for violation of the rules of self-regulatory organizations").  Plaintiff, who admits that DTC is an SRO (VC ¶ 9), has no right to assert a claim that DTC has violated its own rules.  *See also* FINRA Mem. at 11-13.

## V.    PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION.

Plaintiff seeks a preliminary injunction against DTC only, restraining it from setting an "ex date" for any distribution of DNIB shares or processing any distribution to its Participants during the pendency of this action.  In other words, Plaintiff seeks to restrain DTC from doing something that it has no intention of doing (nor authority to do so); *i.e.*, setting an ex-date; and otherwise holding any future distributions in limbo as Plaintiff litigates this action.

Plaintiff cannot satisfy the standards for obtaining a preliminary injunction as set forth in *Ferring Pharmaceuticals, Inc. v. Watson Pharmaceuticals, Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).

In the first instance, in light of the compelling grounds for dismissing the Complaint set forth above, plaintiff cannot establish the fundamental element likelihood of success on the merits.  While not repeating its previous arguments, DTC would emphasize two points:  (1)  Plaintiff's arguments that FINRA acted improperly in not setting an ex-date (Pl. PI

Mem. at 4-6, 9) are not cognizable on a motion directed to DTC and DTC defers to FINRA's regulatory authority with respect to setting or not setting ex-dates.  (2)  Plaintiff's argument that "DTC's implementation of interim accounting procedures . . . would not contravene the Plan . . . ." (Pl. PI Mem. at 10), is completely beside the point.  As explained above (*supra* at 15), DTC's interim accounting service only comes into play under certain circumstances, including when FINRA sets a late ex-date.  Since FINRA did not set a late (or any) ex-date, this service has no relevance, whether or not it is consistent or inconsistent with the Plan.

Second, Plaintiff alleges irreparable injury based on its argument that FINRA and DTC "goofed with respect to the Initial Equity Distribution" and it is therefore "highly likely" that they will repeat the same errors in any future distribution.  (Pl. PI Mem. at 11).  Again, Plaintiff's argument that DTC "goofed" is premised on a mistaken notion that DTC sets ex-dates and, in this case, set the wrong one and will do so again.  There is nothing but Plaintiff's implausible supposition and surmise to support this argument that DTC has any authority to set ex-dates, late or otherwise.  *See supra* at 9-10.  To the extent that Plaintiff further argues that it faces irreparable injury because it has no damages remedy (Pl. PI Mem. at 12), even if that were true the proper venue for redress would have been the Bankruptcy Court, which Plaintiff did not pursue.  *See* FINRA Mem. at 6-9.

Finally, in balancing any interests in considering whether to enjoin any future distributions, DTC would note that as of the Distribution Record Date, DTC had numerous Participants to whose accounts beneficial interests in DNIB shares were credited and who would be expecting future distributions, which Plaintiff seeks to delay indefinitely.  It should further be noted in this context that it was Plaintiff who, while fully aware of the language of the Plan that the Initial Equity Distribution would be paid "*only*" to "beneficial owners of the shares as of the

COB on the Distribution Record Date, and not persons who purchases shares thereafter" (VC ¶ 24 (emphasis in VC)), nonetheless decided to pursue an investment strategy based on purchasing shares one day late.  Those facts weigh against granting preliminary relief in balancing the interests of those who would be adversely affected by a preliminary injunction as well the question of the "public interest."  Pl. PI Mem. at 13.

<u>CONCLUSION</u>

For the foregoing reasons, DTC's cross-motion to dismiss should be granted with prejudice and Plaintiff's motion for a preliminary injunction should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Donna L. Culver*

R. Judson Scaggs, Jr. (#2676)
Donna L. Culver (#2983)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
rjscaggs@mnat.com
dculver@mnat.com
   *Attorneys for Defendant The Depository*
   *Trust Company*

OF COUNSEL:

Gregg M. Mashberg
Proskauer Rose LLP
Eleven Times Square
New York, NY  10036-8299

April 25, 2017

10996092