**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| B.E. CAPITAL MANAGEMENT FUND LP, on behalf of itself and all others similarly situated, | |
| Plaintiff, | Case No. 17-311 GMS |
| - against - | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. and THE DEPOSITORY TRUST COMPANY, | |
| Defendants. | |

## <u>MEMORANDUM OF LAW IN OPPOSITION TO FINRA'S MOTION TO DISMISS</u>

KLEIN LLC
Julia B. Klein (DE 5198)
919 North Market Street
Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

*Counsel for Plaintiff
and the Putative Class*

Dated: May 29, 2017
          Wilmington, Delaware

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................I

TABLE OF AUTHORITIES ...........................................................................................II

PRELIMINARY STATEMENT ...................................................................................... 1

RESPONSE TO FINRA'S STATEMENT OF FACTS ................................................... 3

ARGUMENT .................................................................................................................. 5

   I.    PLAINTIFF'S CLAIM IS NOT BARRED BY THE DOCTRINE OF EQUITABLE
MOOTNESS ................................................................................................................... 5

          A.   *The Relief Sought by Plaintiff Will Not Require Unscrambling of the Plan*............5

          B.   *Application of the FINRA Rules Will Not Harm Innocent Third Parties*...............6

          C.   *Relief Can and Should be Fashioned*....................................................................7

   II.    PLAINTIFF'S CLAIM IS NOT PRECLUDED................................................ 8

          A.   *Claim Preclusion is Inapplicable* ..........................................................................8

          B.   *Issue Preclusion is Inapplicable* ...........................................................................9

   III.   PLAINTIFF'S CLAIM IS NOT BARRED BY THE DOCTRINE OF SELF-
REGULATORY ORGANIZATION IMMUNITY ................................................... 10

          A.   *SRO Immunity is Derivative of that Possessed by the SEC, and the SEC is Not
Immune from Declaratory Judgment Actions under the Administrative Procedures Act*......10

          B.   *SRO Immunity Only Applies Where FINRA is Engaged in a Function that
Materially Relate to Broker-Dealer Regulation, and is Inapplicable Where FINRA is
Engaged in an Issuer-Related Function*..............................................................................12

   IV.     PLAINTIFF HAS A PRIVATE RIGHT OF ACTION AGAINST FINRA .................. 15

CONCLUSION............................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Antoine v. Byers & Anderson*, 508 U.S. 429, 432 (1993) ............................................. 13

*Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 757 F.2d 676, 687 (5th Cir. 1985) ... 13

*Butz v. Economou*, 438 U.S. 478 (1978) .................................................................. 13

*CalPERS v. NYSE*, 503 F.3d 89 (2d Cir. 2007) ......................................................... 12

*CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187 (3d Cir. 1999) ......................... 8

*D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93 (2d Cir. 2001) .................... 11, 12, 14

*Desiderio v. NASD*, 191 F.3d 198 (2d Cir. 1999) ..................................................... 16

*Dexter v. Depository Trust and Clearing Corp.*, 406 F. Supp. 2d 260 (S.D.N.Y. 2005), *aff'd* 219 Fed. App'x 91 (2d Cir. 2007) .................................................................. 2, 12, 14

*DL Capital Group, LLC v. Nasdaq Stock Market, Inc.*, 409 F.3d 93 (2d Cir. 2005) .................. 11

*Feins v. Am. Stock Exchange, Inc.*, 81 F.3d 1215 (2d Cir. 1996) ................................ 15

*In re NYSE Specialists Secs. Litig.*, 503 F.3d 89 (2d Cir. 2007) ................................ 13

*In re Olick*, 99-5128, 2000 U.S. Dist. LEXIS 4275, 2000 WL 354191 (E.D. Pa. April 4, 2000), *aff'd* 275 F.3d 37 (table) (3d Cir. 2001) .......................................... 12

*In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110 (D.C. Cir. 2008) ..... 15, 16

*Lanier v. BATS Exchange, Inc.*, 838 F.3d 139 (2d Cir. 2016) ...................................... 15

*Lobaito v. Fin. Indus. Regulatory Auth.*, 2014 U.S. Dist. LEXIS 126004, 2014 WL 4470423 (S.D.N.Y. Sept. 9, 2014), *aff'd*, 599 Fed. App'x 400 (2d Cir. 2015) ..................... 16

*MM&S Fin., Inc. v. NASD*, 364 F.3d 908 (8th Cir. 2004) .......................................... 16

*PennMont Sec. v. Frucher*, 534 F. Supp. 2d 538 (E.D. Pa. 2008), *vacated on other grounds*, 586 F.3d 242 (3d Cir. 2009) ............................................................................. 12

*Raytech Corp. v. White*, 54 F.3d 187 (3d Cir. 1995) .................................................. 9

*Sparta Surgical Corp. v. NASD*, 159 F.3d 1209 (9th Cir. 1998) ................................ 12

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ...................................................... 12

*U.S. v. Athlone Indus., Inc.*, 746 F.2d 977 (3d Cir. 1984) ......................................... 9

*Weissman v. Nat'l Assn of Sec. Dealers, Inc.*, 500 F.3d 1293 (11th Cir. 2007) ..................... 13, 14

**Statutes**

15 U.S.C. § 78s ................................................................................................................ 11

17 CFR 240.10b-17 ........................................................................................................ 4, 5

5 U.S.C. § 701(a) ............................................................................................................ 11

5 U.S.C. § 702 ................................................................................................................. 11

**Other Authorities**

S. Rep. No. 94-75, 94th Cong. 1st Sess. ......................................................................... 14

**Rules**

FINRA Rule 11100(a) ..................................................................................................... 1, 2

FINRA Rule 11140(b) ................................................................................................ passim

FINRA Rule 11140(b)(2) ................................................................................................ 5, 8

FINRA Rule 11630(c) .................................................................................................. 5, 6, 8

**Regulations**

Regulation Systems Compliance and Integrity, Exchange Act Release No. 73639 (Nov. 19, 2014) ............................................................................................................................ 13

Plaintiff B.E. Capital Management Fund LP, on behalf of itself and all others similarly situated, respectfully submits this memorandum of law in opposition to FINRA's motion to dismiss.[1]

## PRELIMINARY STATEMENT

The question before this Court is simple: Is the payment of a distribution by an issuer's successor (the Trustee) to shareholders on account of shares held while they traded over-the-counter an "over-the-counter secondary market transaction in securities" under Rule 11100(a)? FINRA does not dispute that if the answer is "yes," as Plaintiff asserts, FINRA is required by its own rules set an ex-date for any future Plan distributions in accordance with Rule 11140(b).

But FINRA asserts the answer is "no" because the Debtors' shares were cancelled under the Plan and ceased trading on October 11, months before a distribution was paid.  FINRA Br. pp. 8 and 13.  However, it cites no authority for that position, which ignores the fact that distributions pursuant to the Plan were and will be made on account of shares that traded OTC in the secondary market (not substitute securities, like liquidating trust units) before the shares were cancelled, and which continue to exist as a technical matter even though public trading has ceased.

FINRA proffers no basis for its assertion that its Rules didn't allow it to set an ex-date for the initial distribution because the Debtors' shares were cancelled under the Plan, and that, therefore, it also cannot set an ex-date for any future distribution.  This position is untenable for a number of reasons:

(1)     Share cancellation under a chapter 11 plan has not previously precluded FINRA from setting a post-record date ex-date.  *See*, *e.g.*, *Dexter v. Depository Trust and Clearing*

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Complaint or Plaintiff's memorandum of law in support of its motion for a preliminary injunction (the "PI Motion").

1

*Corp.*, the   406 F. Supp. 2d 260, 262 (S.D.N.Y. 2005), *aff'd*, 219 Fed. App'x 91 (2d Cir. 2007) ("in accordance with the directives issued by the NASD [setting an ex-date pursuant to Rule 11140(b)(2)], [DTC] distributed the proceeds to UFTC shareholders as of June 25, 2004, in effect benefitting those who had purchased *cancelled shares* of [the debtor] after the effective date of the Plan") (*emphasis* added).

(2)     FINRA posted a daily list notice for the initial distribution based on information in a then-proposed plan even though the Debtors and FINRA knew that if the plan were confirmed then the Debtors' shares would be cancelled *before* payment of the initial distribution.  Thus, if share cancellation were an impediment to setting an ex-date, there would have been no reason to post the daily list notice for the initial distribution.  The fact that it did suggests FINRA does not believe share cancellation under a Plan affects application of the UPC.

(3)     That DTC was able to make the initial distribution on account of shares even though they were cancelled by the Plan strongly indicates share cancellation does not impede DTC's normal functions, which include applying interim accounting procedures where FINRA sets a post-record date ex-date.  *See* **Exhibit A** [email exchanges between DNIB's Liquidating Trustee and DTC in connection with initial distribution].

Because Rule 11100(a) makes the UPC applicable to distributions of DNIB stock, FINRA *must* set an ex-date under Rule 11140(b) for future Plan distributions.  At a minimum, whether FINRA is, under certain circumstances, precluded, and excused, from setting an ex-date is a fact question not suitable for determination on a motion to dismiss.

FINRA's arguments that Plaintiff's action is barred by the doctrine of equitable mootness, issue or claim preclusion, and SRO immunity likewise are without merit.  As is set forth in detail below, the relief sought does not implicate, let alone would it unscramble the Plan. For that reason,

the issue raised herein neither was raised nor litigated in connection with Plan confirmation. FINRA's assertion to the contrary quite simply is wrong.  And the Kevlar-like qualities it touts do not immunize FINRA from suits like this that do not materially pertain to regulation of its broker-dealer members.   Even the SEC, FINRA's Federal regulatory body, has rejected FINRA's argument in this regard.

## RESPONSE TO FINRA'S STATEMENT OF FACTS

Even though the initial distribution was coded "CD" in the September 1 daily list notice, conveying to the marketplace FINRA believed Rule 11140(b)(2) applied, FINRA contends the Comment thereon – "Distribution & Pay Date TBD.  Distribution will not be quoted Ex by FINRA. Please see Bankruptcy Plan, Issuer's SEC filings for additional details."–communicated to investors that FINRA would *not* be setting an ex-date for this or subsequent distributions.  FINRA Br. pp. 4-5.

Nothing in that Comment, however, communicated as much.

(1)     The first sentence ("Distribution & Pay Date TBD.") simply suggests that as of September 1, 2016, FINRA was unable to set an ex-date for the initial distribution.  This makes sense, because, at the time, the distribution amount and payable date information an issuer is required to submit at least ten days prior to a distribution under Rule 10b-17 had not yet been submitted to FINRA.

(2)     The second sentence ("Distribution will not be quoted Ex by FINRA.") suggests that post-announcement (*i.e.*, post September 1) shares were trading *with* the distribution attached to them.  *See* Complaint ¶ 29.

(3)     Nor does the third sentence ("Please see Bankruptcy Plan, Issuer's SEC filings for additional details.") indicate FINRA would not be setting an ex-date, because nothing

in the Plan or SEC filings states that FINRA will not be applying Rule 11140(b)(2) and normal due bill procedures, once a distribution is made to Distribution Record Date shareholders in accordance with the Plan. FINRA's reliance on the Trustee's representations in SEC filings that shares purchased post-Distribution Record Date are worthless is misplaced. Form 8-Ks and 10-Qs are mere disclosures by the issuer, and no reasonable investor would conclude they trump the plain language of FINRA's Rules, which FINRA does not dispute have the force of law.

(4)     It is absurd that FINRA purports to rely on Comments made on a daily list notice posted for the *initial* distribution contemplated by a chapter 11 plan to convey to the marketplace that it had no intention of setting an ex-date for *any* distributions made pursuant to that plan (if subsequently confirmed).

FINRA also states it could not set an ex-date for the initial distribution because, when the Debtors proposed their initial chapter 11 plan on August 15, 2016, FINRA did not have the distribution amount or payable date information required by Rule 10b-17 under the Exchange Act to set an ex-date. FINRA Br. pp. 4-5. Even if true, that FINRA, on September 1, 2017 lacked the distribution amount and payable date information required to set an ex-date for the initial distribution, this did not *permanently* relieve FINRA from having to set an ex-date for that distribution once that information became available.[2]

---

[2] Post-confirmation, the Trustee in fact provided the distribution amount and payable date information required by Rule 10b-17 to FINRA before making the initial distribution in December 2016, meaning FINRA could have easily at that point set an ex-date for the distribution. *See* Ex. A.

## ARGUMENT

### I. PLAINTIFF'S CLAIM IS NOT BARRED BY THE DOCTRINE OF EQUITABLE MOOTNESS

#### A. The Relief Sought by Plaintiff Will Not Require Unscrambling of the Plan

FINRA argues that the equitable mootness doctrine bars Plaintiff's claim because the relief sought allegedly conflicts with the Plan's distribution provisions. FINRA Br. p. 6. That this is not so is evidenced by FINRA's inability to identify which Plan provisions would be rendered inoperative if this Court directed it to set an ex-date for future distributions. The distribution provisions at issue are paragraph 20 of the Confirmation Order, Section X.J of the Plan, and section 9.1 of the Trust Agreement. In essence, those provisions direct the Trustee to make distributions to beneficial owners as of the Distribution Record Date, as reflected in the books and records of the Debtors' transfer agent.

Application of Rules 11140(b)(2) and 11630(c) would not contravene those provisions at all. Pursuant to Rule 10b-17, prior to making a distribution under the Plan, the Trustee is required to notify FINRA of the record date, payable date, and distribution amount. As required by Rule 10b-17, the Trustee furnished this information to FINRA prior to making the initial distribution in December 2016. Rule 11140(b) required FINRA to set an ex-date for that distribution based the information provided by the Trustee.

If Rule 11140(b)(1) applies, the ex-date would be two business days before the record date specified by the Trustee, and the distribution would be the made to Distribution Record Date shareholders in accordance with the Plan as a result of the T+3 Rule.

If Rule 11140(b)(2) applies, the ex-date will be the last business day on which the shares traded prior to the post-record date ex-date. Significantly, however, the distribution will not be paid to those shareholders; instead the distribution will be paid to Distribution Record Date

shareholders, a result consistent with the Plan. It is not until *after* the distribution is paid to record date shareholders and funds are deposited in their accounts—on the due bill settlement date—that funds are pulled from record date shareholders' accounts and redistributed to shareholders as of the last business day on which shares traded prior to the post-record date ex-date in accordance with Rule 11630(c) pursuant to the due bill process and DTC's interim accounting procedures, and those have nothing to do with the Plan.

In other words, no conflict exists between the Plan and the FINRA Rules, whether FINRA sets an ex-date under Rule 11140(b)(1) or (b)(2), because in both situations distributions under the Plan would be paid to Distribution Record Date shareholders in accordance with the Plan.

Finally, awarding Plaintiff judgment on its claim would not unscramble the Plan because Plaintiff's claim only affects *future* distributions under the Plan. Plaintiff has repeatedly stated it is not looking to unwind the initial distribution. Accordingly, the equitable mootness doctrine is inapplicable here.

### B.      Application of the FINRA Rules Will Not Harm Innocent Third Parties

FINRA asserts innocent third parties that relied on the Plan's distribution provisions would be harmed if it were forced to follow its own rules. FINRA Br. pp.7-8. As noted above, that argument fails because application of the FINRA Rules is consistent with the Plan's distribution provisions. It also fails because the opposite holds true: Innocent parties reasonably and in good faith relied on FINRA's September 1, 2017 daily list notice when they purchased shares post-Distribution Record Date because they had no reason to believe that FINRA would be ignoring its own rules–which, unlike the Trustee's representation's in SEC filings, enjoy the force of law. Those innocent third parties were harmed by FINRA's failure to set an ex-date pursuant to Rule 11140(b) in connection with the initial distribution, and those innocent third parties will be harmed

even more should FINRA again fail to set an ex-date pursuant to Rule 11140(b) in connection with a future distribution.

### C.   Relief Can and Should be Fashioned

FINRA asserts "there is literally nothing FINRA can do here" because "shares in the Debtor no longer exist because confirmation of the plan cancelled them" and the shares ceased trading.  FINRA Br. pp.8, 13.

This is incorrect.  The shares still exist as a technical matter, even though they ceased trading OTC on October 11, as evidenced by the fact that (1) the shares still appear on Plaintiff's brokerage account statements (*see* **Exhibit B** hereto), and (2) Plaintiff has received offers to purchase Plaintiff's shares after October 11.  In addition, pursuant to the Confirmation Order (which trumps the Plan), the cancellation of the shares is a legal fiction, and was only effected "*except* for purposes of evidencing a right to receive a Distribution." Confirmation Order ¶¶ 15, 45 (*emphasis* added).

More importantly, relief can be fashioned by a declaratory judgment that FINRA is required to set an ex-date.  If FINRA sets an ex-date, then due bill and interim accounting procedures will be applied to any distribution paid to the Debtor's transfer agent and made to beneficial owners through DTC.  As a result, after that distribution is paid to Distribution Record Date shareholders in accordance with the Plan, the dividends associated with the distribution will be allocated to shareholders as of the last business day on which the Debtors' shares traded prior to the post-record date Rule 11140(b)(2) ex-date, October 11, 2016. FINRA has no basis for asserting that its setting an ex-date will not remedy the problem Plaintiff asks this Court to address

because the problem will be remedied by DTC and its participants, the entities responsible for processing and making the distribution to beneficial owners after the ex-date is set.[3]

The Plan's fictional cancellation of DNIB shares did not prevent DTC from making the initial distribution to record date shareholders – the same shareholders who will receive any future distribution if FINRA set an ex-date in accordance with Rule 11140(b)(2).

## II.     PLAINTIFF'S CLAIM IS NOT PRECLUDED

FINRA asserts Plaintiff is precluded from bringing this action because it did not object to Plan confirmation or appeal the Confirmation Order and that the issue raised herein previously was litigated in the Bankruptcy Court.  FINRA Br. p. 8.  FINRA does not state whether its argument is premised on the doctrines of claim or issue preclusion.  In any event, neither doctrine applies or affects the justiciability of the matters asserted herein.

### A.     Claim Preclusion is Inapplicable

Claim preclusion, or *res judicata*, "gives dispositive effect to a prior judgment if a particular issue, although not litigated, could have been raised in the earlier proceeding." *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 (3d Cir. 1999).  Claim preclusion bars a lawsuit where there was a final judgment on the merits, the prior suit involved the same parties or their privies, and the present suit is based on the same causes of action as the prior suit." *U.S. v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984).   Claim preclusion is inapplicable here. First, Plaintiff is not in privity with the objecting investor (who was not a shareholder as of the Distribution Record Date).  And second, as noted above and in the PI Motion, the issue raised

---

[3] Even if DTC were unable to make a distribution to October 11 shareholders through its participants, the redistribution of such dividend from Distribution Record Date shareholders to October 11 shareholders would still be required by FINRA Rules 11140(b)(2) and 11630(c).  In fact, DTC's Service Guides state the entire purpose of interim accounting procedures is to avoid shareholders having to make manual distributions as required by the FINRA Rules in situations where FINRA sets a post-record date ex-date.

herein was not the subject of a proper confirmation objection because the Plan's distribution provisions and its fixing of an August 30, 2016 record date are entirely consistent with FINRA's Rules.

### B.    Issue Preclusion is Inapplicable

Issue preclusion, or collateral estoppel, requires a finding that "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995). None of these elements are satisfied.

(1)    The Issue Herein was Not Previously Litigated.    The sole confirmation objection interposed was based on the false premise that a conflict exists between the Distribution Record Date under the Plan and Rule 11140(b).  No such conflict exists, as the distribution would be paid to Distribution Record Date shareholders regardless of whether FINRA set an ex-date under Rule 11140(b)(1) or (b)(2).

(2)    The Issue Herein was Not Previously Adjudicated.  Judge Shannon stated in his bench decision that notwithstanding his confirmation of the Plan, FINRA is well within its power to subsequently set an ex-date for any distribution under the Plan pursuant to Rule 11140(b)(2). D.I. 4, pp. 8-11 (parsing and annexing the bench decision).[4]  Significantly, after delivering his decision, the objecting shareholder asked Judge Shannon to clarify if "your order is that … the record date will be maintained and that the plan will be implemented as set forth by the

---

[4] FINRA asserts that Judge Shannon rejected the issue B.E. Capital seeks to litigate here, citing to almost the entire confirmation transcript (pp. 9-48) and substantially all of Judge Shannon's bench decision (pp. 4-12).  The documents speak for themselves. Having considered the parties' arguments at confirmation, Judge Shannon concluded in his bench decision that nothing precluded FINRA from setting an ex-date for distributions post-confirmation.

debtors," in which case the distribution may be reallocated to holders as of the last business day on which the shares traded prior to the post-record date ex-date pursuant to the FINRA Rules after the distribution is paid to Distribution Record Date shareholders, or whether the decision determines "who is legally entitled to the underlying distributions." D.I. 4-12 p. id #295.  Judge Shannon punted, and simply responded "I am confirming the debtors' plan."  *Id*.  That is, Judge Shannon was *invited* to hold Plan confirmation barred subsequent application of the FINRA Rules, or an action seeking a declaratory judgment that FINRA is required to apply the same, yet he expressly declined to do so.

        (3)     <u>There Was No Prior Determination Concerning the Issue Herein, Let Alone One Necessary to the Bench Decision</u>.  Judge Shannon did not decide the issue herein.  He confirmed the Plan on the grounds that its distribution provisions were clear, FINRA had not set an ex-date inconsistent with the Plan, and the relevant inquiry at confirmation was limited to whether the Plan satisfied the requirements of Bankruptcy Code section 1129.

        (4)     <u>Plaintiff Was Not Represented at Confirmation</u>.  Plaintiff did not join in the confirmation objection or appeal the Confirmation Order because it disagreed with the objection's premise and did not believe the Confirmation Order presented any appealable issues.  Neither the objecting investor nor his counsel represented Plaintiff.

## III.    PLAINTIFF'S CLAIM IS NOT BARRED BY THE DOCTRINE OF SELF-REGULATORY ORGANIZATION IMMUNITY

### A.    SRO Immunity is Derivative of that Possessed by the SEC, and the SEC is Not Immune from Declaratory Judgment Actions under the Administrative Procedures Act

It is well established self-regulatory organization ("<u>SRO</u>") immunity is *derivative* of that possessed by the SEC.  *See, e.g., D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 105

(2d Cir. 2001) ("The NYSE, as a[n] SRO, *stands in the shoes of the SEC* in interpreting the securities laws for its members and in monitoring compliance with those laws. It follows that the *NYSE should be entitled to the same immunity enjoyed by the SEC* when it is performing functions delegated to it") (*emphasis* added); *accord DL Capital Group, LLC v. Nasdaq Stock Market, Inc.*, 409 F.3d 93, 97 (2d Cir. 2005) (because SRO "performs a variety of regulatory functions that would, in other circumstances, be performed by [the SEC]—an agency which is accorded sovereign immunity from all suits for money damages—the NYSE should, in light of its special status and connection to the SEC, out of fairness be accorded full immunity from suits for money damages, as well").

This is significant because under the Administrative Procedures Act, the SEC is *not* immune from declaratory judgment actions:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. ***An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States*** or that the United States is an indispensable party.

5 U.S.C. § 702 (*emphasis* added).[5]  Moreover, section 702's sovereign immunity waiver applies to any claim for relief other than monetary damages, whether brought under the APA or not. *Trudeau v. FTC*, 456 F.3d 178, 186-87 (D.C. Cir. 2006).

---

[5] Pursuant to 5 U.S.C. § 701(a), there is no waiver of sovereign immunity where "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." Neither exception applies here. The Exchange Act does not preclude judicial review and does not furnish Plaintiff with an alternative avenue for relief. Further, there is no statute or regulation affording the SEC or FINRA unlimited discretion with respect to the enforcement of FINRA Rules. In fact, 15 U.S.C. § 78s provides that such rules have the force of law, making clear unlimited discretion is lacking.

Indeed, every decision relied on by FINRA for the proposition that Plaintiff's suit is barred is premised on the doctrine of SRO immunity precluding suits for monetary damages, not declaratory relief.[6] The distinction between suits for monetary damages and declaratory relief was made clear by one of the first courts to hold that SROs could be immune. *Austin Mun. Sec., Ind. v. Nat'l Assn of Sec. Dealers, Inc.*, 757 F.2d 676, 690 (5th Cir. 1985) ("Even though a civil cause of action against [NASD, FINRA's predecessor] for personal liability is foreclosed, **suits for injunctive or declaratory relief may still be brought**") (**emphasis** added).  In short, immunizing FINRA from a suit like this would give it *more* protection than its regulating Federal agency, the SEC, has.

### B.   SRO Immunity Only Applies Where FINRA is Engaged in a Function that Materially Relate to Broker-Dealer Regulation, and is Inapplicable Where FINRA is Engaged in an Issuer-Related Function

It is well established the SRO immunity doctrine must be narrowly construed.  *See, e.g., In re Facebook, Inc., IPO & Secs. & Derivative Litig.*, 986 F. Supp. 2d 428, 453 (S.D.N.Y. 2013) ("Grants of immunity must be narrowly construed because they deprive injured parties of remedies[.]") (internal quotation omitted); *see also Marbury v. Madison, 5 U.S. 137, 147, 2 L. Ed. 60 (1803)* ("It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress.").  As noted by the SEC in an *amicus* brief filed at the

---

[6] *D'Alessio*, 258 F.3d at 93, *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110 (D.C. Cir. 2008) ("*Series 7*"), *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89 (2d Cir. 2007) ("*NYSE Specialists*"), *Dexter*, 406 F. Supp. 2d at 260, *aff'd* 219 Fed. App'x at 91, and *In re Olick*, 99-5128, 2000 U.S. Dist. LEXIS 4275, 2000 WL 354191, *4 (E.D. Pa. April 4, 2000), *aff'd* 275 F.3d 37 (table) (3d Cir. 2001) involved suits for affirmative damages and held only that SROs are immunized from liability in suits **for damages**. *PennMont Sec. v. Frucher*, 534 F. Supp. 2d 538, 541 (E.D. Pa. 2008), *vacated on other grounds*, 586 F.3d 242 (3d Cir. 2009) cites *Olick*, 2000 U.S. Dist. LEXIS 4275, 2000 WL 354191, *4 (E.D. Pa. April 4, 2000), *aff'd* 275 F.3d 37 (table) (3d Cir. 2001), *CalPERS v. NYSE*, 503 F.3d 89, 98 (2d Cir. 2007), and *Sparta Surgical Corp. v. NASD*, 159 F.3d 1209, 1215 (9th Cir. 1998) for the proposition that the Philadelphia Stock Exchange is immune from civil suits for injunctive relief "complaining of actions taken pursuant to [its] regulatory authority," but each of those decisions states only that SRO immunity properly is invoked only when affirmative recovery is sought.

Second Circuit's request in *City of Providence v. BATS Global Markets, Inc.*, No. 15-3057 (2d Cir.

Nov. 28, 2016) (attached as **Exhibit C**, the "SEC Br."):

> Because absolute immunity means that "the victim of an abuse
> of office may receive no recompense for the injury done," courts
> have "limited this extraordinary foreclosure of remedies." *Austin*
> *Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 757 F.2d 676,
> 687 (5th Cir. 1985). And courts "must be 'careful not to extend the
> scope of the protection further than its purposes require.'"
> *Weissman v. Nat'l Assn of Sec. Dealers, Inc.*, 500 F.3d 1293, 1297
> (11th Cir. 2007) (*en banc*) (quoting *Forrester v. White*, 484 U.S.
> 219, 224 (1988)). Consequently, this Court has cautioned that, given
> the "rare and exceptional character" of absolute immunity, "courts
> must examine [its] invocation … on a case-by-case basis," with "the
> party asserting immunity bear[ing] the burden of demonstrating [an]
> entitlement to it." *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89,
> 96 (2d Cir. 2007); *see also Antoine v. Byers & Anderson*, 508 U.S.
> 429, 432, 433 n.4 (1993) (immunity should be afforded "quite
> sparing[ly]"); *Butz v. Economou*, 438 U.S. 478, 508 (1978) ("a
> considered inquiry" is required); Regulation Systems Compliance
> and Integrity, Exchange Act Release No. 73639 (Nov. 19, 2014),
> 2014 WL 6850916, at *90 n.675 ("The Commission notes that SRO
> immunity applies only under certain circumstances.").

SEC Br. pp. 21-22.

Consistent with the foregoing, the SEC stated immunity should only be afforded to SROs

when they either "act as regulators of their members" or are engaged in functions that "materially

relate to the [SROs'] regulation of their members." *Id.* pp. 22-26. Moreover, the SEC's

conclusions in this regard are entitled to deference, unlike FINRA's (and DTC's) self-interested

arguments.

Significantly, the SEC *rejected* FINRA's argument herein, and *dicta* from the District

Court's decision in *Dexter* (that suit was properly dismissed because it sought monetary damages),

that the SRO immunity doctrine protects SROs from all suits premised upon their exercise of some

regulatory function:

13

*At time this this Court [the Second Circuit] has used broad language that could arguably be construed to extend immunity beyond the core SRO function of member discipline and related efforts to regulate members*—suggesting, for, for example, that immunity applies when an SRO "perform[s] important governmental functions" or engages in activity that "relate[s] to the proper functioning of the regulatory system." *NYSE Specialists*, 503 F.3d at 96 [. . .]. *But this language must be read in the particular context of those cases*, which, as explained above, all involved the "governmental function" of member regulation. *Cf. Weissman* [*v. NASD*, 500 F.3d 1293, 1298 (11th Cir. 2007)] (rejecting NASDAQ's overly broad reading of *D'Alessio's* language). *Use of such broad language to define the bounds of immunity in a different context would conflict with this Court's caution that absolute immunity be extended only "on a case-by-case basis."* *NYSE Specialists*, 503 F.3d at 96. And adopting an approach to SRO immunity untethered from the function of member regulation would present substantial conceptual difficulties. *Without that core function as a guide, it is exceedingly difficult (if not impossible) to determine which of a variety of functions of a quasi-governmental entity like an exchange are the "governmental" ones, and which are not. See, e.g.*, S. Rep. No. 94-75, 94th Cong. 1st Sess., 1975 WL 12347, at *23 (warning that "care should be exercised" to avoid the "impression that the industry and the government fulfill the same function in the regulatory framework or that they enjoy the same order of authority or deserve the same degree of deference, whether by firms, courts or the Congress"). This difficulty may explain why the district court reached the conclusion that proprietary feeds and complex order types were "governmental" in nature, while co-location services were not. [. . .] Neither party appears to defend this distinction on appeal, and we cannot discern a principle that would justify it.

*In contrast, the concept of "member regulation" is more concrete, more near to the core of the absolute immunity doctrine, and more consonant with the traditional understanding of self-regulation under the securities laws. See* S. Rep. No. 94-75, 94th Cong. 1st Sess., 1975 WL 12347, at *23 (describing "delegated governmental power" as power "to enforce … compliance by members"); *id.* (emphasizing that the "concept of 'membership' … is fundamental to the self-regulatory system").

SEC Br. pp.27-28 (*emphasis* added).

The conduct at issue herein does not materially relate to, or even involve, FINRA acting as a regulator of its members.  FINRA's members are broker-dealers.  Application of the Rules which form the basis for Plaintiff's claim (or the UPC generally) has nothing to do with FINRA's regulation of broker-dealers.  Rather, the conduct at issue relates solely to FINRA's issuer-related functions—the setting of an ex-date for issuer distributions under the UPC—which are entirely distinct from its broker-dealer regulatory functions.

## IV.  PLAINTIFF HAS A PRIVATE RIGHT OF ACTION AGAINST FINRA

FINRA asserts that Plaintiff has no private right of action against FINRA to enforce the UPC.  FINRA Br. pp.11-12.

That argument fails because Plaintiff has no administrative or other remedy against FINRA, given that Plaintiff seeks relief with respect to FINRA Rules governing issuer-related functions.  As set forth in *Feins v. Am. Stock Exchange, Inc.*, 81 F.3d 1215, 1221-24 (2d Cir. 1996), the existence of an implied right of action under the Exchange Act is linked to the availability of administrative remedies.  *See also Series 7*, 510 F. Supp. 2d at 46-48 (observing that the line of cases holding in general terms there is no private right of action to enforce SRO rules is based on preemption doctrine, which is inapplicable where statutory scheme does not provide administrative remedy); *Lanier v. BATS Exchange, Inc.*, 838 F.3d 139, 147 (2d Cir. 2016) (intent to preclude district court jurisdiction must be "fairly discernible [from] SEC's scheme of administrative and judicial review").

Literally every decision cited by FINRA in support of its position Plaintiff has no private right of action features plaintiffs that had an administrative remedy.  *See Lobaito v. Fin. Indus. Regulatory Auth.*, 2014 U.S. Dist. LEXIS 126004, 2014 WL 4470423, at *7 (S.D.N.Y. Sept. 9, 2014), *aff'd*, 599 Fed. App'x 400 (2d Cir. 2015) (denying private right of action against FINRA

15

for failure to comply with rules governing processing securities industry registration termination, which action was commenced *after* plaintiff lost FINRA arbitration relating to termination of his employment); *Desiderio v. NASD*, 191 F.3d 198, 208 (2d Cir. 1999) (plaintiff could not pursue tort claims against NASD relating to NASD requirement that prospective brokers agree to arbitrate employment disputes); *MM&S Fin., Inc. v. NASD*, 364 F.3d 908 (8th Cir. 2004) (plaintiff challenged obligation to arbitrate customer disputes); *Series 7*, 548 F.3d at 110 ("Plaintiffs … had the benefit of every available administrative remedy").  Thus, the logical premise of these decisions is inapplicable, and Plaintiff's claim should not be dismissed on the grounds that no private right of action exists to enforce UPC compliance.

Moreover, given the absence of an administrative or other remedy, a judicial determination that Plaintiff cannot assert a private assert a claim against FINRA would make its determinations on issuer-related functions unappealable, and would thus confer greater protection on FINRA than that afforded the SEC, an absurd result given that FINRA determinations are not even entitled to deference.

## CONCLUSION

For all the foregoing reasons, FINRA's motion to dismiss should be denied.

Respectfully submitted,

Dated: May 29, 2017
      Wilmington, Delaware

KLEIN LLC

*/s/ Julia Klein*
Julia B. Klein (5198)
919 North Market Street
Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

*Counsel for Plaintiff*
*and the Putative Class*

16